**UNITED STATES of America, Norma Colon, Plaintiffs–Appellants,**

**Maria E. Gonzalez, Tammy Auer, Theresa Caldwell–Benjamin, Intervenors–Plaintiffs–Appellants,**

v.

**CITY OF NEW YORK, Jason Turner, individually and in his capacity as Commissioner of the New York City Human Resources Administration, George Santiago, in his individual capacity, Defendants–Appellees.**

Docket Nos. 02–6102(L), 02–6112(L), 02–6122, 02–6124, 02–6126, 02–7405(CON).

United States Court of Appeals, Second Circuit.

Argued:  Feb. 5, 2003.

Decided:  Feb. 13, 2004.

Sarah S. Normand, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, Neil M. Corwin and Jeffrey S. Oestericher, Assistant United States Attorneys, on the brief), New York, NY, for Plaintiff–Appellant United States.

Timothy J. Casey, Now Legal Defense and Education Fund (Jennifer K. Brown and Yolanda S. Wu, Now Legal Defense and Education Fund; Marc Cohan and Anne Pearson, Welfare Law Center, on the brief), New York, NY, for Plaintiff–Appellant Norma Colon.

Timothy J. Casey, Now Legal Defense and Education Fund, New York, N.Y. (Jennifer K. Brown and Yolanda S. Wu, Now Legal Defense and Education Fund, and Daniel D. Leddy, Staten Island, NY, on the brief) for Intervenor–Plaintiff–Appellant Tammy Auer.

Mordecai Newman, Assistant Corporation Counsel for the City of New York (Michael A. Cardozo, Corporation Counsel, and Larry A. Sonnenshein and Marilyn Richter, Assistant Corporation Counsels, on the brief), New York, NY, for Defendants–Appellees.

Juan Cartagena, Risa E. Kaufman, Community Service Society of New York, New York, NY; Elaine R. Jones, Director–Counsel, Norman J. Chachkin, James L. Cott, Elise C. Boddie, NAACP Legal Defense & Educational Fund, Inc., New York, N.Y. for Amici Curiae, NAACP Legal Defense and Educational Fund, Inc., Community Service Society of New York, and Puerto Rican Legal Defense and Education Fund.

Catherine K. Ruckelshaus, Noah D. Zatz, National Employment Law Project, New York, NY; Jonathan P. Hiatt, Lynn Rhinehart, American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO"); Judith L. Lichtman, Jocelyn C. Frye, National Partnership for Women & Families, Washington, D.C., for Amici Curiae AFL–CIO, New York State AFL–CIO, Lawyers' Committee for Civil Rights Under Law, Mexican–American Legal Defense and Educational Fund, National Asian Pacific American Legal Consortium, National Employment Law Project, National Partnership for Women & Families, National Women's Law Center, National Workrights Institute, and Women Employed.

Before: JACOBS and POOLER, Circuit Judges, GLEESON, District Judge.*

POOLER, Circuit Judge.

We are asked to determine whether welfare recipients obliged to participate in New York City's Work Experience Program ("WEP") are employees within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and thus entitled to Title VII's protections

---

* The Honorable John Gleeson, United States District Judge for the Eastern District of New York, sitting by designation.

against sexual and racial harassment. Applying this circuit's test for the existence of an employer-employee relationship, we conclude that the district court erred by finding as a matter of law on a Rule 12(b)(6) motion that plaintiffs are not employees. We also conclude that the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which requires participation in certain work activities including programs like WEP as a condition of the receipt of welfare benefits, does not evince an intent to deprive these workers of Title VII's civil rights protections. Our conclusion accords with the conclusions reached by the federal agencies charged with enforcing Title VII and PRWORA. We therefore vacate the judgment and remand for further proceedings.

## BACKGROUND

### The Statutory Framework of the Work Experience Program

In 1996, Congress enacted, and the president signed, PRWORA. This act ended the previous program for providing assistance to needy families, Aid to Families With Dependent Children ("AFDC"), and authorized a new and time-limited program, Temporary Assistance to Needy Families ("TANF").

The purpose of the new program is "to increase the flexibility of States in operating a program designed to" meet certain goals including "end[ing] the dependence of needy parents on government benefits by promoting job preparation, work, and marriage." 42 U.S.C. § 601(a). As a condition of receiving TANF grants, states must ensure that certain percentages of families participate in work activities. 42 U.S.C. § 607(a). "Work activities" include: unsubsidized employment; subsidized private sector employment; subsidized public sector employment; work experience; on-the-job training; job search and job readiness assistance; community service programs; vocational education; job skills training; education related to employment (for individuals without high school degrees or high school equivalency certificates); secondary school attendance or study leading to an equivalency certificate; and provision of child care services for individuals participating in community service programs. 42 U.S.C. § 607(d)(1)-(12). When an individual refuses to participate in a work activity, PRWORA requires the state to "(A) reduce the amount of assistance otherwise payable to the family pro rata (or more, at the option of the State)...; or (B) terminate such assistance, subject to such good cause and other exceptions as the State may establish." 42 U.S.C. § 607(e)(1). Section 608(c) provides that such a reduction "shall not be construed to be a reduction in any wage paid to the individual."

PRWORA also provides under the caption, "Nondiscrimination provisions":

The following provisions of law shall apply to any program or activity which receives funds provided under this part:

(1) the Age Discrimination Act of 1975, (42 U.S.C. 6101 et seq.)

(2) Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794).

(3) The Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.)

(4) Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.)

42 U.S.C. § 608(d).

Finally, PRWORA limits federal enforcement authority as follows: "No officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617.

New York has implemented PRWORA through Chapter 55 of the Social Services Law. However, New York's work requirements apply not only to families with children, as does TANF—the federal welfare program created by PRWORA—but also to households without dependent children that consequently receive only state funding. N.Y. Soc. Serv. L. § 335–b(1). A recipient who refuses to engage in a work activity incurs a pro rata reduction of his household's grant. NY Soc. Serv. L. § 342(2), (3).

As an alternative to other "work activities" authorized by PRWORA and by state statute, New York social services districts may require recipients of public assistance to participate in "work experience in the public sector or non-profit sector." N.Y. Soc. Serv. L. § 336(1)(d). In order to calculate the number of hours a recipient may be required to participate in a work experience activity, New York divides the amount of assistance payable to the recipient including food stamps by the higher of the federal minimum wage or the state minimum wage. N.Y. Soc. Serv. L. § 336–c(2)(b). In addition, New York human resource agencies can assign recipients to a given task only if they are "provided appropriate workers' compensation or equivalent protection for on-the-job injuries and tort claims protection on the same basis, but not necessarily at the same benefit level, as they are provided to other persons in the same or similar positions," and "the project to which the participant is assigned serves a useful public purpose." N.Y. Soc. Serv. L. § 336–c(2)(c) & (d). WEP participants also receive authorized child care expenses and transportation expenses.

### Plaintiffs' Allegations

Because a Rule 12(b)(6) motion tests only the adequacy of the complaint, we summarize plaintiffs' claims in some detail. *See Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001).

### Tammy Auer

In January 1997, New York City's Human Resources Administration ("HRA") assigned Tammy Auer to do general office work at the City's Sanitation Department. Auer's supervisor, James Soto, immediately began to make inappropriate, sexually charged comments to Auer. He also asked her to move in with him and told her that they could make a beautiful baby. Each day Soto asked Auer to come into his office, instructed her to turn around, and then commented on her appearance.

During spring 1998, Soto escalated his behavior to inappropriate touching. Not only did Soto ignore Auer's objections, but he also warned her that he could terminate her WEP assignment. Auer complained to the Sanitation Department's Staten Island borough commissioner, who took no action. After she complained to the department's Manhattan office, she was transferred to a different facility. However, Soto, who continued to have supervisory responsibility for Auer, went to her new work site and screamed at her. He also instructed Auer's immediate supervisor not to give her any work to do. Shortly thereafter Auer quit because of the way she had been treated. She filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"), which after finding reasonable cause to believe her allegations were true, referred her charge to the United States Department of Justice ("DOJ"). *See* 42 U.S.C. § 2000e–5(f)(1) (authorizing EEOC to refer charges against governments, government agencies, and political subdivisions to the Attorney General).

### Tonja McGhee

In April 1998, HRA assigned Tonja McGhee to work for the New York City

Housing Authority ("NYCHA"). Three months later she began to perform a maintenance job at the Roosevelt Houses in Brooklyn. Within a month, McGhee began a consensual sexual relationship with her supervisor, Choice Bennett. However, in August 1998, she broke off this relationship. Thereafter, Bennett called McGhee at home on a daily basis and threatened to "get her" if she did not resume the relationship. In addition, Bennett falsely informed his supervisor that McGhee was not doing her work.

In October 1998, Bennett directed McGhee to enter his office, turned off the lights, and told McGhee to take her pants down. McGhee ran out of the office. She also complained both to Bennett's supervisors and to a WEP coordinator about the harassing conduct. The WEP coordinator took no action, but one of Bennett's supervisors arranged for McGhee's transfer to a location several blocks away where Bennett continued to call McGhee and to threaten her. McGhee made complaints to her supervisor, but the supervisor took no action. Therefore, in May 1999, McGhee stopped working at her assignment and filed a charge of discrimination with EEOC. On October 5, 1999, EEOC found reasonable cause to accept the truth of McGhee's allegations and referred her charge to DOJ.

*Maria Gonzalez*

In spring 1997, HRA assigned Maria Gonzalez to do clerical work in its Manhattan offices. Within a week, Gonzalez's supervisor, Gregory Payne, began touching her without her consent. Gonzalez thwarted Payne's attempt to grope her genital area by pushing him away, but he frequently touched and twirled her hair and blew on her neck. On several occasions, Payne observed that Gonzalez had worn a long skirt and told her that the skirt "made it easier for [him] to get at her."

After Gonzalez rebuffed Payne's advances, he frequently called her a "lesbian," a "bitch," and "hideous" and said that "all [she] needed was a man." Payne also made it more difficult for Gonzalez to verify her hours by taking her time cards. When Gonzalez complained to Payne's supervisor, Robert Estelle, he told her that she would have to resolve the issue with Payne.

In January 1999, Payne grabbed Gonzalez and attempted to kiss her. During the next two months, Payne twice threatened to have her killed. In March 1999, Gonzalez complained to Robert Fox, another of Payne's supervisors. Fox told Gonzalez to put her complaint in writing and responded to the written complaint by transferring Gonzalez to another location where there was no work for her. HRA then transferred Gonzalez to a third location where working conditions were so poor that she left. Gonzalez filed an EEOC charge. EEOC found reasonable cause to support the charge and referred it to DOJ.

*Theresa Caldwell–Benjamin*

In July 1996, HRA assigned Theresa Caldwell–Benjamin, an African–American woman, to work for the City's Parks Department. Her tenure with the Parks Department was uneventful until March 1998 when she was assigned to paint the interior of a building on Staten Island. On the first day of her assignment, she observed a noose hanging in one of the windows of the building as well as a racist caricature of a black man and boy. Caldwell–Benjamin complained to her WEP supervisor, who told her that the other employees meant nothing by the noose and caricature. The noose remained in the window during the entire week that Caldwell–Benjamin worked there. Although the racist caricature was removed during the painting, it was replaced after the painting was completed. On October 4, 1999, EEOC found

that Caldwell–Benjamin's subsequent complaint was supported by reasonable cause and referred the charge to DOJ.

*Norma Colon*

On May 5, 1997, HRA assigned Norma Colon to work at its Office of Employment Services as a computer operator. During Colon's orientation, she noticed her supervisor, George Santiago, staring at her.. After the orientation, Santiago invited Colon to lunch. Santiago also arranged for Colon's desk to be next to 'his. Santiago frequently and usually outside the presence of others told Colon that he had a nice car and wanted to take her to parties. On one occasion, Santiago said that Colon's stomach was bloated and asked if she was having her period. He also referred to the "big boobs" of women in a beauty contest he had judged. On the same occasion, Santiago told Colon that she could solve all her problems by spending the night with him at a motel. In apparent retaliation for Colon's lack of response, Santiago refused to help Colon to obtain necessary childcare and she was forced to leave her placement. Colon also filed an EEOC complaint. EEOC found reasonable cause to support her charges and issued a right to sue letter on June 28, 2001.

*District Court Proceedings*

In May 2001, the United States brought a lawsuit against the city and NYCHA pursuant to 42 U.S.C. § 2000e–5(f)(1), which allows the Attorney General to sue to redress charges of discrimination filed with the EEOC against states and municipalities. The United States acted on behalf of Gonzalez, Auer, Caldwell–Benjamin, and McGhee.[1] All four women moved to intervene in the government's lawsuit, and Auer sought to add claims based on state

and local anti-discrimination law. In September 2001, Colon filed a lawsuit asserting both federal and state discrimination claims on her own behalf.

Defendants moved to dismiss both lawsuits pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). In support of both motions, defendants argued that the individual plaintiffs were not employees within the meaning of Title VII and that, even assuming they would otherwise be considered employees, 42 U.S.C. §§ 608(d) and 617 evince an intent that Title VII not apply to WEP participants. The court consolidated the lawsuits for the purpose of hearing and deciding the motions.

Although defendants argued both lack of subject matter jurisdiction and failure to state a claim, the district court assumed that jurisdiction existed and resolved the motion under Federal Rule of Civil Procedure 12(b)(6). In an unpublished opinion and order dated March 8, 2002, Judge Richard Conway Casey granted defendants' motions, holding that defendants were not employees within the meaning of Title VII. After noting that we require a putative employee to demonstrate that she was "hired" before reviewing common law factors to determine whether the individual is an employee or an independent contractor, Judge Casey pointed out that the individual plaintiffs did not allege they were hired. Equating "hiring" with the receipt of "direct or indirect remuneration from the alleged employer," the judge found that plaintiffs did not receive "employment-related benefits from Defendants." The factors supporting Judge Casey's conclusion were (1) Section 608(c)'s instruction that discontinuance of TANF benefits based on failure to comply with

---

1. On appeal, McGhee settled her claims against defendant NYCHA. Because neither

she nor NYCHA is now a party to this appeal, we have not included McGhee or NYCHA in

work requirements is not a reduction in wages; (2) his own assessment that "[e]very benefit [p]laintiffs received resulted from their status as welfare recipients;" (3) plaintiffs' non-receipt of benefits such as pensions, survivors benefits, sick pay, and health insurance that we and other courts have considered in determining whether an individual who does not receive wages is an employee; and (4) plaintiffs' potential entitlement to workers compensation benefits in amounts different from those received by other employees.

Although the EEOC previously had announced in an enforcement guideline that PRWORA participants could be employees under appropriate circumstances, Judge Casey found EEOC's position to conflict with Second Circuit cases and thus to be unpersuasive. He rejected similar positions by the Department of Labor and Department of Health and Human Services because these agencies are not charged with administering Title VII. Having found that the plaintiffs were not employees within the meaning of Title VII, Judge Casey had no need to determine whether Sections 608(d) and 617 of PRWORA are intended to exclude from Title VII protections persons performing work activities as a condition of TANF eligibility.

Defendants had not objected to the intervention of any of the individual plaintiffs except Auer, who attempted to make state and local law claims. Judge Casey denied Auer's motion to intervene as moot and also declined to exercise supplemental jurisdiction over Colon's state law claims.

Plaintiffs appealed, arguing that their complaints sufficiently alleged their status as Title VII employees to withstand a motion to dismiss and that PRWORA does not preempt Title VII. Colon also contends that the court erred by dismissing her state law claims. Two groups of amici consisting of civil rights and workers' rights organizations have submitted briefs in support of plaintiffs' position.

## DISCUSSION

### I. Standard

We review a Rule 12(b)(6) dismissal de novo, accepting all of the plaintiff's allegations as true and drawing all inferences in a manner favorable to the plaintiff. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). Complaints alleging civil rights violations must be construed especially liberally. *Id.*

### II. Overview

To determine whether Title VII covers WEP participants, we look first to Title VII itself and to cases interpreting it. If the individual plaintiffs fall within Title VII's definition of an employee, we then must examine whether PRWORA is intended to preempt Title VII's coverage for WEP.[2]

### III. Coverage Under Title VII

Title VII itself defines an employee as "an individual employed by an employer." 42 U.S.C. § 2000e(f). In applying this somewhat "circular" definition, we use a two-part test. *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir.1997). First, the plaintiff must show she was

the caption and the Clerk is directed to delete them from the official caption.

**2.** Defendants claim they are not making a preemption argument, but arguing that the plain language of PRWORA demonstrates that Congress did not intend to extend Title VII coverage to TANF beneficiaries. This argu-

ment is, of course, a preemption argument. If Title VII covers WEP participants by its own terms, it is of no moment that PRWORA is silent on the issue. Thus, defendants can argue only that PRWORA evinces an intent to repeal coverage that would otherwise exist, which is a preemption argument.

hired by the putative employer. *Id.* To prove that she was hired, she must establish that she received remuneration in some form for her work. *Id.* at 116. This remuneration need not be a salary, *Pietras v. Board of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 473 (2d Cir.1999), but must consist of "substantial benefits not merely incidental to the activity performed," *York v. Association of the Bar of the City of New York*, 286 F.3d 122, 126 (2d Cir.), *cert. denied*, 537 U.S. 1089, 123 S.Ct. 702, 154 L.Ed.2d 633 (2002). Once plaintiff furnishes proof that her putative employer remunerated her for services she performed, we look to "the thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)" to determine whether an employment relationship exists. *Eisenberg v. Advance Relocation and Storage, Inc.*, 237 F.3d 111, 113–14 (2d Cir.2000). These factors, which derive from the federal common law of agency, are

> the hiring party's right to control the manner and means by which the product is accomplished[;] the skill required; the sources of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee ben-

efits; and the tax treatment of the hired party.

*Reid,* 490 U.S. at 751–52, 109 S.Ct. 2166 (footnotes omitted). We place the greatest emphasis on "the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks." *Eisenberg,* 237 F.3d at 114 (internal quotation marks omitted)

Defendants tacitly concede, as they must, that plaintiffs' work was completely controlled by the various agencies for which they worked but argue that plaintiffs do not satisfy the first *O'Connor* prong, being "hired," because they received no remuneration for their work.

We disagree. The plaintiffs allege that they received cash payments and food stamps in return for their work for the city. Those payments equaled the minimum wage times the number of hours the plaintiffs worked. A plaintiff who unjustifiably refused to work would lose the portion of the family's grant attributable to her. Thus, each plaintiff had to work in order to receive her share of the family grant. A functional commonsense assessment of the plaintiffs' alleged relationship with the city results in the conclusion that they were employees.

In addition, plaintiffs received other benefits including transportation and child care expenses and eligibility for workers' compensation because of their work. Contrary to the district court's position, these benefits do not flow solely from their status as welfare recipients. The individual plaintiffs must perform useful work to receive any of the benefits. *See* N.Y. Soc. Serv. L. § 336–c(2)(b). Because these benefits are substantial,[3] they satisfy the *O'Connor/Pietras/York* test.

---

**3.** The dissent disparages the importance of workers' compensation to the WEP participant, characterizing it as "chiefly a benefit for the employer." Dissent at 107. This argu-

ment ignores the history and purpose of workers' compensation statutes. The primary purpose of those laws was "to provide benefits to the victims of work-related injuries by

■ In addition, the plaintiffs' position is consistent with that of the agency charged with interpreting Title VII, the EEOC, which has amended its compliance manual to state:

> A welfare recipient participating in work-related activities as a condition for receipt of benefits will likely be an "employee." The fact that an entity does not pay the worker a salary does not preclude the existence of an employer-employee relationship. The determination of whether there is an employment relationship is based on the same factors outlined above [the *Reid* factors].

EEOC Notice No. 915.003 § 5.a (Dec. 3, 1997). The EEOC also instructs that

> welfare recipients would likely be considered employees in most of the work activities described in the new welfare law, including unsubsidized and subsidized public and private sector employment, work experience, and on-the-job training programs. On the other hand, individuals engaged in activities such as vocational education, job search assistance, and secondary school attendance would probably not be covered.

EEOC Notice No. 915.002 § 5.a (Dec. 3, 1997) (footnotes omitted). These interpretations, which are neither adjudications nor the result of notice and comment rulemaking, are "entitled to respect ... only to the extent that [they] have the power to persuade." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (internal quotation marks omitted). The district court found EEOC's opinion unpersuasive because it relied on the *Reid* factors and did not address this court's substantial economic benefit test. However, the EEOC's division of persons performing work activities into those presumably receiving some remuneration for services rendered to an agency (those participating in subsidized and unsubsidized public and private sector employment, work experience, and on-the-job training) and those neither rendering services nor receiving remuneration (students and participants receiving job search assistance) is reasonable and completely consistent with the Second Circuit's employee test. Thus, it was entitled to respect.[4]

Despite our cases, the substantial work-related benefits plaintiffs received, and the

allocating the burden of payments to the employer and therefore ultimately to consumers." 4 J.D. Lee & Barry A. Lindahl, *Modern Tort Law* § 43.10, at 43–20 (2d ed.2002). The laws relieve the injured worker of the need to bring a tort action, to prove fault on the part of the employer, and to wait until the conclusion of a potentially lengthy court proceeding to obtain compensation. *Id.* "Given the limited hopes a worker might have under the common law rules, workers' compensation statutes represented progressive reform." 2 Dan B. Dobbs, *The Law of Torts* 1098 (2001). The dissent underplays the importance of the benefit to the worker by discussing only the medical coverage provided. Workers compensation also provides cash benefits, N.Y. Workers' Comp. L. § 14, and scheduled awards in the case of certain disabilities, *id.* § 15.

Of course workers' compensation schemes include benefits for employers as well. In particular, by extinguishing the tort action in exchange for the no-fault benefit, the schemes eliminate the potential for the ruinous verdicts that might otherwise be obtained by injured workers who have the wherewithal to bring a lawsuit and establish negligence. That employers obtain this benefit does not alter the fact that workers compensation is a significant benefit to the worker and particularly to the worker who may not be able to establish negligence.

4. We note that the Supreme Court recently placed significant weight on another portion of the EEOC Compliance Manual in addressing the Americans with Disabilities Act's definition of employee. *Clackamas Gastroenterology Assocs. v. Wells,* 538 U.S. 440, 123 S.Ct. 1673, 1679–81, 155 L.Ed.2d 615 (2003).

EEOC's position, defendants contend that the individual plaintiffs are not employees. Relying primarily on a case from the Tenth Circuit, and one from the New York Court of Appeals, defendants argue that the benefits and income plaintiffs receive are part of a scheme of public assistance benefits rather than remuneration for work performed. The dissent also suggests that *O'Connor* precludes employee status for plaintiffs. Finally, both the dissent and the defendants claim that 42 U.S.C. § 608(c) requires a finding that plaintiffs are not employees. In the succeeding paragraphs, we explain why defendants'—and the dissent's—reliance on these cases and on Section 608(c) is misplaced.

In *Johns v. Stewart*, 57 F.3d 1544 (10th Cir.1995), the court found that participants in a Utah public assistance program that antedated PRWORA and required recipients' "participation in a broad range of adult education, short-term skills training, community work and job search activities" were not employees within the meaning of the Fair Labor Standards Act ("FLSA"). 57 F.3d at 1550, 1559. The Tenth Circuit rejected employee status because the work component was "just one requirement of ... comprehensive assistance programs" with many other components. *Id.* at 1558. It noted that recipients applied for public assistance, and not for a job, that taxes were not withheld from their grants, and "that they do not receive the same salary, safe working conditions, job security, career development, Social Security, pension rights, collective bargaining, or grievance procedures as do the actual employees." *Id.* at 1559 (internal quotation marks omitted).

█ For several reasons, *Johns* does not persuade us that WEP participants cannot be considered Title VII employees. First, *Johns* is not a Title VII case and the workfare program was not governed by PRWORA. Therefore, the *Johns* court did not use the *O'Connor* analysis or consider the administrative interpretations relevant to Title VII or to PRWORA. Second, as we discuss below, even with respect to the statute *Johns* does construe, the FLSA, the Department of Labor ("DOL"), the agency charged with interpreting the FLSA, has rejected the *Johns* approach. Third, there is no indication in *Johns* that the participants received the full range of benefits received by WEP participants or that they were required to perform useful work. Finally, the *Johns* analysis and most of defendants' arguments rest on an artificial dichotomy: one must be either a welfare recipient or an employee and cannot be both. *Johns,* 57 F.3d at 1558. For instance, defendants argue that the Human Resources Administration could have terminated or reduced plaintiffs' grants for any one of a number of reasons, not just for their failure to accept an assignment to WEP. They also point out that a parent's failure to work does not result in the termination of the entire family's public assistance grant and that the benefits the participant receives are calculated on the basis of her family's need and not based on the amount or the type of work she performs. The answer to defendants' arguments and to *Johns* is that we have not adopted an either/or approach to employee status. Instead, we recognize that a person may be an employee with respect to certain of his duties and not be an employee with respect to others. *EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1539–40 (2d Cir.1996) (holding that corporate directors who also served as officers and/or employees of the corporation could be outside the scope of Title VII in their capacity as directors but protected by Title VII as officers and employees); *see also Baker v. McNeil Island Corr. Center*, 859 F.2d 124, 128–29 (9th Cir.1988)

(reversing Rule 12(b)(6) dismissal of prison inmate's Title VII claim related to his application for a library-aide job that paid $30 per month and offered some training).

Defendants also rely on *Brukhmam v. Giuliani*, 94 N.Y.2d 387, 705 N.Y.S.2d 558, 727 N.E.2d 116 (N.Y.2000), in which the New York Court of Appeals found that WEP participants are not employees within the meaning of a New York constitutional provision requiring contractors and subcontractors performing public work to pay their employees the prevailing wage for their work. 705 N.Y.S.2d at 561, 727 N.E.2d 116. *Brukhmam* addressed New York State Constitution article I, § 17, "which extends prevailing wage protection only to employees of contractors and subcontractors performing public work." 705 N.Y.S.2d at 561, 727 N.E.2d 116 (internal quotation marks omitted). In addition to finding that the plaintiffs were not employees "within the intendment of the New York Constitution," the Court also found that the plaintiffs did not perform public works and did not work for contractors or subcontractors. *Id.* at 562–63. Thus, whether or not WEP participants are employees, they would not be covered by Article I § 17 because they do not work for contractors or subcontractors within the meaning of Article I and are not engaged in "public works."

It is the difference in purpose between the New York constitutional provision and Title VII that best distinguishes *Brukhmam* from this case. Article I § 17 of the New York Constitution grants special economic rights to certain classes of workers, i.e, they must receive the prevailing wage in the community for the work they perform if the employer receives a public works contract. Title VII in contrast accords the basic civil right of freedom from discrimination to all employees employed by covered employers. In light of the very different scope of Section 17 and Title VII, it would be foolhardy to assume that the New York Court of Appeals would extend its interpretation of the prevailing wage provision to Title VII. In addition, *Brukhman* does not employ our long-established test for an employer-employee relationship and does not take into account the views of the agencies charged with enforcing Title VII and PRWORA.

The dissent cites *O'Connor* for the proposition that "although compensation by the *putative employer* in exchange for his service is not a sufficient condition, ... it is an essential condition to the existence of an employer-employee relationship." Dissent at [36] (quoting *O'Connor*, 126 F.3d at 116; internal quotation marks omitted; emphases added). O'Connor a college student, performed field work at a psychiatric hospital and received federal work study funding from the college she attended. She sued not the college but rather the psychiatric hospital, the state that operated the hospital, and her supervisor, who allegedly had sexually harassed her. In holding that O'Connor could not sue under Title VII or Title IX, we pointed out that the psychiatric hospital had "no affiliation to" the college that, using federal funds, paid O'Connor. *Id.* at 119. Simply put, the putative employer paid nothing to the putative employee. In contrast, the City is both the payor and the recipient of the plaintiffs' services in this case. Thus, the rationale of *O'Connor* does not apply.

Defendants also argue that unlike the benefits we previously have considered significant in the Title VII context such as sick and medical leave, pensions, and health insurance, the benefits plaintiffs received—a cash grant, transportation and child care expenses, and eligibility for workers' compensation—are not typically associated with employment. Workers' compensation, of course, is typically associ-

ated with employment, and the fact that WEP participants *may* receive only a partial benefit, N.Y. Soc. Serv. L. § 336–c(2)(c), is not dispositive in light of this circuit's definition of an employee. Payment of money is also typically associated with employment. Moreover, the number of hours a recipient can be required to work is based on the size of her grant divided by the minimum wage, N.Y. Soc. Serv. L. § 336–c(2)(b), an all too typical way of calculating compensation for work. Finally, reimbursement for child care and transportation expenses may not be typical compensation for employment, but they are payments that are necessary only because the recipient works. They are not offered solely or primarily for the employer's benefit.

■ Finally, defendants rely on 42 U.S.C. § 608(c), which provides that a penalty imposed against a person "by reason of the failure of the individual to comply with a requirement under the State program funded under this part shall not be construed to be a reduction in any wage paid to the individual." 42 U.S.C. § 608(c). This provision is the linchpin of the dissent, which reads Section 608(c) as an "unambiguous command" from Congress that WEP participants' benefits must not be considered wages. Dissent at [38]; *see also id.* at[32] ("The welfare benefits received by WEP participants are not wages because [PRWORA] says they are not . . . .").

This argument cannot be squared with the text of Section 608(c). Congress could easily have said that the benefits at issue in this case may not be considered wages, but it did not. Rather it said that the *withholding* of benefits (to penalize workers) may not be considered a reduction in wages. If the benefits were not considered wages (or the equivalent of wages) to

begin with, Section 608(c) would be superfluous.

Logically, the fact that a penalty imposed on an individual WEP participant may not be considered a reduction in wages does not imply that the individual does not receive wages in the first instance. Plaintiffs in these cases must work in exchange for payments equal to the minimum wage times the number of hours they work. A failure to show up for work without good cause will produce (in the first instance) a pro rata reduction of those payments until the plaintiff returns to work. N.Y. Soc. Serv. L. § 342(2)(a). At that time, the payments resume, again at the rate of the minimum wage. Thus, the sanction is the loss of payments, not a wage reduction. An absent employee does not suffer a wage reduction simply because her pay is docked.

In short, Section 608(c) does not say that plaintiffs' benefits are not wages, and indeed the provision only makes sense if the opposite is true. Moreover, Section 608(c) eliminates a contradiction that otherwise would exist between the penalty provisions for recalcitrant workers and the requirement that welfare recipients who are forced to work not be paid below the minimum wage. *See id.* § 336–c(2)(b). For example, a WEP participant's second unexcused failure to appear at work results in a three-month loss of payments for the participant if the participant is the parent of a dependent child. *See id.* § 342(2)(b). Thus, even if the worker missed only one month of work, and is willing to resume working immediately, her payments are docked for three months. In that event, the "benefits" divided by the hours worked produces a wage far below the minimum wage, and thus a possible violation of New York Social Services Law Section 336–c(2)(b). Section 608(c) allows the state to impose

the penalty without violating the minimum wage requirement.

Even if Section 608(c) were—implausibly—read as a decree that the payments to these plaintiffs could not be considered wages, we would still find plaintiffs to be employees. We have held that a person need not receive wages in order to be considered an employee under Title VII. *Pietras v. Board of Fire Comm'rs,* 180 F.3d 468, 473 (2d Cir.1999). Moreover, the applicability of Title VII turns on the substance of the relationship between plaintiffs and defendants, not on labels affixed by statutes.

We conclude that the relationship alleged here—which includes the cash payment, the related benefits, and the re- quirement that the plaintiffs' work be useful—if proved, establishes the plaintiffs as employees for the purposes of Title VII.[5]

## IV. Preemption

Having determined that the allegations of the complaint sufficiently establish the individual plaintiffs' status as Title VII employees, we turn to the question of whether Congress in enacting PRWORA intended to take away Title VII protections from WEP participants. In order for one federal statute to preempt or

implicitly repeal another, there must be "express manifestations of a preemptive intent." *United States v. General Dynamics Corp.,* 19 F.3d 770, 774 (2d Cir.1994). "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

Defendants find a clearly expressed congressional intention to remove WEP participants from the protection of Title VII in (1) Sections 608(d) and 617 of PRWORA; (2) the presence of a global non-discrimination provision in the legislation governing TANF's predecessor, AFDC; and (3) Congress's adoption, after it enacted PRWORA, of an amendment forbidding gender discrimination in a related program and referring enforcement to state agencies.

Section 608(d) provides that four specific discrimination laws apply to "any program or activity which receives funds provided under [PRWORA]": the Age Discrimination Act of 1975, Section 504 of the Rehabilitation Act, the American with Disabilities Act, and Title VI of the Civil Rights

---

**5.** The dissent argues that our reading of the statute is "unnecessary" because it "offers no incremental protection from sex discrimination." Dissent at 103. If that is true—that is, if WEP participants are no better off with Title VII protection than without it—it is difficult to understand why, as the dissent further argues, the chief impact of our decision will be to impair "the flexible and temporary nature of WEP assignments." Dissent at 103. It is equally difficult to understand how depriving WEP participants of a Title VII remedy for sexual harassment in the workplace would foster flexibility in welfare reform, or why that sort of flexibility would be a positive thing.

In fact, it is not true that Title VII "offers no incremental protection from sex discrimination." Section 603(a)(5)(I)(iv) of Title 42, on which the dissent relies, protects only participants in the Welfare to Work ("WtW") program, which is discussed below; it does not protect TANF recipients who may be WEP participants but do not receive WtW services. *See id.* In addition, the grievance procedure provided for in Section 603(a)(5)(I)(iv) makes no provision for judicial review, an important aspect of Title VII. New York Social Services Law § 331(3), also cited by the dissent, simply prohibits discrimination and provides no remedy for the aggrieved WEP participant.

Act. Each of these laws contains provisions that forbid discrimination in programs or activities receiving federal assistance. *See* 42 U.S.C. § 6101, 29 U.S.C. § 794, 42 U.S.C. § 12132, 42 U.S.C. § 2000d.

Defendants rely on the maxim, "expressio unius est exclusio alterius," to argue that Congress's list of statutes governing programs that receive federal financial assistance means its failure to list statutes governing discrimination in employment is significant. We disagree. First, "[s]ince not every silence is pregnant, *expressio unius* is an uncertain guide to interpretation." *Westnau Land Corp. v. United States Small Business Admin.,* 1 F.3d 112, 116 (2d Cir.1993) (internal quotation marks omitted). Second, the maxim applies only when the statute identifies "a series of two or more terms or things that should be understood to go hand in hand," thus raising the inference that a similar unlisted term was deliberately excluded. *Chevron U.S.A., Inc., v. Echazabal,* 536 U.S. 73, 81, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002). Section 608(d) includes non-discrimination laws applicable to programs or activities that receive PRWORA funds. These programs and activities include functions like education and vocational training that, due to the absence of an employment relationship, clearly are not subject to Title VII. Title VII, on the other hand, governs employment relationships whether federally funded or not. Therefore, Congress's failure to list Title VII with the "programs or activities" discrimination provisions is not a clear indication of Congressional intent to exclude from the protection of Title VII those PRWORA participants who under Title VII would be employees.

Defendants also rely on Section 617, which as previously noted, provides that "[n]o officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any pro- vision of this part, except to the extent expressly provided in this part." Based on this provision, defendants argue that Section 608(d) contains the only anti-discrimination provisions that the federal government can enforce.

Of course any preemptive effect that Section 617 might have would limit only the government's enforcement powers. Individual WEP participants would remain free to sue under Title VII or any other applicable statute. More significantly, Section 617 applies only to the provisions of PRWORA, and Title VII is not part of PRWORA. Therefore, Section 617 does nothing to restrict DOJ's enforcement of Title VII on behalf of WEP participants.

Next, defendants find significance in the inclusion in the former AFDC/JOBS program of a requirement that state agencies ensure that "[i]n assigning participants ... to any program activity ... individuals are not discriminated against on the basis of ... sex ... and all participants will have such rights as are available under any applicable Federal ... law prohibiting discrimination." H.R.Rep. No. 104–651, at 908. They argue that Congress's failure to include similar language in PRWORA evinces Congressional intent to remove those protections. Because the AFDC/ JOBS program was repealed in its entirety, no particular significance attaches to the revocation of this provision. In fact, Congress also repealed a provision stating that AFDC payments to workfare participants were not "compensation for work performed." *Id.* at 904. Since this provision suggests that AFDC workfare participants were not employees within the meaning of Title VII, the repeal of the AFDC/JOBS program can just as logically—or illogically—be seen as a manifestation of Congressional intent that WEP participants be covered by Title VII as of Congressional intent to the contrary.

Finally, defendants discern a Congressional intent that Title VII not apply to PRWORA participants in a 1997 amendment to PRWORA authorizing Welfare–to–Work ("WtW") grants, 42 U.S.C. § 603(a)(5). The parties agree that some TANF recipients are eligible for WtW services but that persons other than TANF recipients also will be eligible. The WtW legislation contains a non-discrimination provision which states:

> (iii) Nondiscrimination. In addition to the protections provided under the provisions of law specified in section 608(c) [*sic*, probably 608(d) intended] of this title, an individual may not be discriminated against by reason of gender with respect to participation in work activities engaged in under a program operated with funds provided under this paragraph.

42 U.S.C. § 603(a)(5)(I)(iii). WtW also provides a state grievance procedure as the exclusive remedy for gender discrimination complaints. 42 U.S.C. § 603(a)(5)(I)(iv). Like PRWORA, WtW includes both activities that would normally be considered employment and activities that would not traditionally be considered employment. *See* 42 U.S.C. § 603(a)(5)(C). The non-discrimination provision in WtW would therefore serve a useful purpose even if Title VII were available to protect employees. Section 608(d)—through its adoption of various other non-discrimination statutes—provides protection against age, disability, race, and national origin discrimination in programs and activities receiving federal financial assistance. Subsection iii of Section 603(a)(5)(I) adds gender discrimination to that list for all activities funded by WtW. Other anti-discrimination statutes like Title VII prohibit the same categories of discrimination for PRWORA participants who also are employees. Thus, WtW's gender discrimination provision is

no stronger a basis for finding preemption than is Section 608(d), which we already have held does not demonstrate preemptive intent.

In fact, the legislative history of the WtW program strongly suggests that Congress intended no preemption. Before Congress authorized the WtW program, DOL issued a guidance indicating that anti-discrimination laws "apply to welfare recipients as they apply to other workers. The new welfare law does not exempt welfare recipients from these laws." United States Department of Labor, How Workplace Laws Apply to Welfare Recipients, at Q & A No. 1 (May 1997, revised Feb. 1999). The omnibus budget bill reported to the House on June 24, 1997, contained a provision specifically designed to override the guidance:

> A recipient of assistance under a State program funded under this part who is engaged in work experience or community service with a public agency or nonprofit organization shall not be considered an employee of the public agency or the nonprofit organization.

H.R.Rep. No. 105–149, at 238, 293. The House later modified this language to provide: "Participants engaged in work experience and community service programs are not entitled to a salary or work or training expenses and are not entitled to any other compensation for work performed." H.R.Rep. No. 105–217, at 934. Neither measure was adopted by Congress and neither became part of the Balanced Budget Act that President Clinton signed into law on August 5, 1997. The Conference Committee report on the bill acknowledged that DOL had determined that "workfare participants may be covered 'employees' and thus would be covered by the Fair Labor Standards Act (FLSA), which sets hour and wage standards, and other employment laws" and

noted that the Committee had rejected the House's effort to override DOL's interpretation. *Id.* The failure of Congress to act when it had knowledge of DOL's interpretation suggests that DOL's interpretation is correct.

■ Regulations issued by the two agencies charged with enforcing PROW-RA, DOL and the Department of Health and Human Services ("HHS") also support finding no preemption. The current DOL regulation on discrimination incorporates all the protections of Section 608(d), *see* 20 C.F.R. § 645.255(a) as well as the gender protections of the WtW program, *see id.*, subd. (b). The regulation also states:

> Complaints alleging discrimination in violation of any applicable Federal, State or local law, such as Title VII of the Civil Rights Act of 1964 (42 U.S.C.2000e *et* seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), the Pregnancy Discrimination Act (42 U.S.C. 2000e (paragraph k)), or Section 188 of the Workforce Investment Act of 1998 (29 U.S.C. 2938) as well as those listed in paragraph (a) of this section, shall be processed in accordance with those laws and the implementing regulations.

20 C.F.R. § 645.255(c). HHS has issued a regulation explicitly stating that Section 617 does not have a preemptive effect on Title VII. It provides:

> The limitation on Federal regulatory and enforcement authority at section 417 of the Act does not limit the effect of other Federal laws, including Federal employment laws (such as the Fair Labor Standards Act (FLSA)), the Occupational Safety and Health Act (OSHA) and unemployment insurance (UI), and nondiscrimination laws. These laws apply to TANF beneficiaries in the same manner as they apply to other workers.

45 C.F.R. § 260.35(b). The district court found these regulations unpersuasive because Title VII is not within either agency's delegated authority. Defendants argue that the regulations deserve no deference because both agencies changed their positions on the issue as the result of public advocacy.

■ Legislative regulations issued after notice and comment rulemaking, as these regulations were, are given "considerable weight." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, no deference is required where the agency acts outside its delegated authority. *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 650, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). The district court found that because HHS and DOL have no authority to define Title VII's coverage, their regulations are not binding. We disagree. DOL and HHS do not purport to define the coverage of Title VII. Instead, their regulations set forth, respectively, the manner in which discrimination claims are to be processed and the lack of preemptive effect attributable to Section 617, both subjects that are well within the respective agency's authority. *See* 42 U.S.C. §§ 602 (granting Secretary of Health and Human Services authority to approve state TANF plans) and 603(a)(5)(C)(ix) (directing Secretary of Labor, after consultation with Secretary of Health and Human Services to promulgate regulations implementing WtW).

Defendants also argue that the DOL and HHS regulations are not entitled to respect because both agencies shifted their positions on the applicability of Title VII to PRWORA participants. The case on which defendants rely, *EEOC v. Arabian Oil Co.,* 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), lists a variety of factors, including consistency over a period

of time, that should be used to determine how much weight to give an EEOC guideline. Because *Arabian Oil* does not address regulations, it is not particularly helpful in this case.

More important, the agencies did not shift position. It is true that DOL did not mention Title VII in the interim final version of Section 645.525. 62 Fed.Reg. 61588, 61608 (Nov. 18, 1997). However, in the preamble to this interim regulation, DOL said: "The Balanced Budget Act of 1997 amended the PRWORA. It provides for, among other things, a new civil rights protection against gender discrimination. This provision ensures that participants who may not be covered under either Title VII of the Civil Rights Act of 1964 or Title IX of the Education Amendments of 1972, are protected against gender discrimination." *Id.* at 61597. Because certain TANF recipients will be neither employees nor students, this comment is entirely consistent with DOL's prior position, as expressed in its guideline, that anti-discrimination laws such as Title VII apply to workfare participants as they do to other workers and with its final regulation, which explains how discrimination complaints of various sorts should be processed. The statement indicates only that some WtW participants may not be employees and thus may not be covered by Title VII.

In the preamble to its final regulations, HHS acknowledged that it had not initially included Title VII or the anti-discrimination provisions in Section 608(d) in its regulation. 64 Fed.Reg. 17720, 17747 (Apr. 12, 1999). The agency noted that its omission had provoked several negative comments and determined

> that [the language in the earlier regulation] did not adequately represent this Administration's commitment to the enforcement of civil rights and labor laws.

In that context, we have decided that we should focus more attention on these protections in the final rule. We can do that without violating section 417 [42 U.S.C. § 617] (in letter or spirit) or interfering with the jurisdiction of other Federal agencies. In light of the concerns raised in these comments, we believed it would be helpful to include the nondiscrimination provisions referenced at section 404(d) of the Act in the regulation. They appear at § 260.35(a). In § 260.35(b), you will find new regulatory language designed to further clarify the protections applicable to TANF programs and activities. In this new clarifying language, we make the point that section 417 of the Act does not limit the effect of other Federal laws, including those that provide workplace and nondiscrimination protections. We also indicate that Federal employment laws and nondiscrimination laws apply to TANF beneficiaries in the same manner as they apply to other workers.

Based on comments we received in this subject area and on some of the fiscal issues being raised, we were concerned that some States were reading the limitations in section 417 more broadly, in effect to free States from all provisions of Federal law, except those in the new title IV–A. In fact, section 417 only limits regulation and enforcement of the TANF provisions. It does not affect the applicability of other Federal laws or the authority of other Federal agencies to enforce laws over which they have jurisdiction.

*Id.* Read in context, it is clear that HHS did not reverse position on the applicability of Title VII. Rather, it initially declined to reference Title VII in its regulations because it is not charged with enforcing Title VII. After receiving comments both from welfare recipient advocates dis-

tressed at the omission and from state officials who believed no federal law except PRWORA had any impact on their administration of PRWORA, HHS changed the regulation only to clarify that PRWORA did not preempt Title VII's protection of employees who also receive TANF funds.

In sum, neither the language of Sections 608(d) and 617 nor the legislative history of PRWORA supports a conclusion that Congress intended to preempt Title VII's protections. In addition, both administrative agencies with a role in administering PRWORA have issued regulations suggesting that no preemption exists. Because the allegations in the complaint sufficiently establish the individual plaintiffs' status as employees within the meaning of Title VII and we discern no preemptive intent in PRWORA, we reverse the district court's dismissal of plaintiffs' Title VII claims.

## V. State and local law claims

Colon argues that if we vacate dismissal of her federal claims, we also should reinstate her related state and local claims. The district court declined to exercise supplemental jurisdiction over state and local claims solely because it had dismissed all claims over which it had original jurisdiction. Because we vacate the dismissal of plaintiffs' federal claims, we also vacate the dismissal of plaintiffs' state and local claims without reaching the merits of those claims and without prejudice to the district court's consideration of other bases for dismissal.

## CONCLUSION

We hold that the allegations of plaintiffs' complaints sufficiently pleaded the individual plaintiffs' status as employees entitled to Title VII's protection and that PRWORA does not preempt Title VII with respect to WEP participants. Because the district court dismissed state and local claims solely for lack of supplemental jurisdiction, these dismissals also must be vacated. We remand for further proceedings consistent with this opinion.

JACOBS, Circuit Judge, dissenting.

I respectfully dissent.

Participants in New York City's Work Experience Program ("WEP") are not covered by Title VII because they are not "employees" of the City of New York. Under the settled principles set out in this opinion: (1) a person is not an employee unless she is "hired" by an employer (and is not an independent contractor); (2) a person is hired only if she receives direct or indirect remuneration for services rendered; (3) the remuneration must be substantial; and (4) remuneration includes wages and benefits but excludes benefits that are incidental to the work.

The welfare benefits received by WEP participants are not wages because the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") says they are not: "A penalty imposed by a State against the family of an individual by reason of the failure of the individual to comply with a requirement under the State program funded under [PRWORA] shall not be construed to be a reduction in any wage paid to the individual." 42 U.S.C. § 608(c). And the several other small accommodations afforded to participants are incidental to their WEP assignments. Thus carfare and child care reimbursements merely facilitate the recipient's appearance at work and forestall excuses for nonappearance; and workers' compensation advantages the City by limiting its liability for accidents at a workfare site. As the majority notes, these supposed benefits "are necessary only because the [welfare] recipient works." Maj. Op. at 95–96. As

our case law demonstrates, however, things that are needed only because someone does work (such as the provision of a desk or a parking space) do not count in assessing whether a person is receiving "substantial benefits" amounting to remuneration.

Thus, an intern at a psychiatric hospital who receives a federal work study grant is not an employee, *O'Connor v. Davis*, 126 F.3d 112, 115–16 (2d Cir.1997); nor is a lawyer volunteering her services to a bar association. *York v. Assoc. of the Bar*, 286 F.3d 122, 125–126 (2d Cir.2002). For the same reasons, a WEP participant assigned to the City for work experience is not a City employee.

The majority's conferral of employee status on WEP participants offers no incremental protection from sex discrimination. That protection is already secured by state law. Congress directed the states to establish remedies for discrimination claims arising out of programs funded under the PRWORA, 42 U.S.C. § 603(a)(5)(I)(iv). In particular, New York State law prohibits the discrimination that is alleged by these plaintiffs. *See* N.Y. Soc. Serv. Law § 331(3) (prohibiting "discrimination on the basis of race, color, national origin, sex, religion or handicap, in the selection of [WEP] participants, their assignment or reassignment to work activities and duties, and the separate use of facilities or other treatment of [WEP] participants"). The holding of the majority opinion is therefore unnecessary to protect the plaintiffs; for the same reason, the section of the majority opinion that recounts "in some detail" the repellent facts of the discrimination alleged by each individual is gratuitous. *See* Maj. Op. at 88–90.

Since the protection against sexual discrimination afforded by the majority opinion is redundant, the only likely impact of this case will be to frustrate important welfare reforms by impairing the flexible and temporary nature of WEP assignments. PRWORA was designed, *inter alia*, to assist state programs that allow welfare recipients to move from dependency to gainful employment via training and workplace experience. 42 U.S.C. § 601(a)(2). If WEP participants are "employees" under federal common law, it may then follow—and it will certainly be argued—that they have a right, like other employees, to unionize, *see* 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing . . . ."), a development incompatible with the statutory goal of a transitional work experience. And there are no doubt other implications under state law of turning thousands of WEP participants into City employees. *Cf. Brukhman v. Giuliani*, 94 N.Y.2d 387, 705 N.Y.S.2d 558, 727 N.E.2d 116 (2000) (discussing, *inter alia*, employee status under the New York State Constitution).

The only other circuit court to consider the question, discussed *infra* Section IV.C, has rejected the idea that workfare participants are employees. *See Johns v. Stewart*, 57 F.3d 1544, 1557–59 (10th Cir.1995) (holding that workfare participants are not employees under the Fair Labor Standards Act).

## I

Title VII defines an "employee" as "an individual employed by an employer," 42 U.S.C. § 2000e(f), a definition that we have called "unhelpful[ ]," *Pietras v. Bd. of Fire Comm'rs*, 180 F.3d 468, 473 (2d Cir.1999), and "circular," *O'Connor*, 126 F.3d at 115. "Courts have assumed, however, that in using the term employee Congress had in mind 'the conventional master-servant re-

lationship as understood by common-law agency doctrine.'" *Pietras*, 180 F.3d at 473 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)). In ascertaining whether WEP participants are "employees" for purposes of Title VII, we therefore look to "the cluster of ideas" attached to that term under the common law. *See INS v. St. Cyr*, 533 U.S. 289, 312 n. 35, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)).

Much of the common law on this subject differentiates employees from independent contractors, *see, e.g., O'Connor*, 126 F.3d at 115, a distinction that is irrelevant here. This Court has pointed out, however, that independent contractors and employees share an essential feature: both are "hired parties." *Id.* (quoting *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). "[T]hus, a prerequisite to considering whether an individual is one or the other under common-law agency principles is that the individual have been hired in the first instance. That is, only where a 'hire' has occurred should the common-law agency analysis be undertaken." *Id.; see Reid*, 490 U.S. at 743, 109 S.Ct. 2166 ("[I]n using the term 'employee,' ... Congress meant to refer to *a hired party* in a conventional employment relationship.") (emphasis added); *cf. Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003) (stating that "[t]he employer can hire and fire employees").

In *O'Connor*, we articulated the requirement that a Title VII plaintiff be "hired in the first instance." *O'Connor*, 126 F.3d at 115. In that case, a college student sued a hospital in which she had been working as an intern, alleging sexual harassment in violation of Title VII. *Id.* at 113. In rejecting the intern's Title VII claim, we held that she had never been hired as a hospital employee because she was owed no "direct or indirect economic remuneration" amounting to "compensation" for her work. *Id.* at 116. We specifically relied on the fact that the plaintiff received "no salary or other wages, and no employee benefits such as health insurance, vacation, or sick pay, nor was she promised any such compensation." *Id.* We explicitly rejected the arguments [i] that receipt of federal work study funding (based on the number of hours she worked at the hospital) was sufficient to make her a hospital employee and [ii] that such a governmental benefit could be considered compensation. *Id.* at 116 n. 2. In dismissing the Title VII claims, we explained that "although 'compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, ... it is an essential condition to the existence of an employer-employee relationship.'" *Id.* at 116 (quoting *Graves v. Women's Prof'l Rodeo Assoc.*, 907 F.2d 71, 73 (8th Cir. 1990)).

The majority opinion attempts to distinguish *O'Connor* on the ground that here "the City is both the payor and the recipient of the plaintiffs' services." Maj. Op. at 95. Casting the City as "payor" glides over the dispositive question: just what is being *paid?* As *O'Connor* holds, unless the payee is being paid *compensation*, the payee is not an employee. As the New York Court of Appeals has held, the "agencies and entities" to which WEP participants are assigned "simply do not pay a salary to the Program participants." *Brukhman*, 94 N.Y.2d at 396, 705 N.Y.S.2d at 563, 727 N.E.2d 116 (internal citation omitted).

The majority attempts to distinguish *Brukhman* on the ground that it would be

"foolhardy to assume that the New York Court of Appeals would extend its interpretation of the prevailing wage provision [of the New York Constitution] to Title VII."[1] Maj. Op. at 95. However, Judge Bellacosa's opinion is categorical on this point, and the court's holding rests on principles applicable to employment status generally:

> [WEP] participants simply are not "in the employ of" anyone—that is the very reason they are receiving welfare benefits and required to participate in the Program, until they can find or be placed in jobs with the customary array of traditional indicia of employment. The Program's policy and procedures manual directs that "participants are expected to seek paid employment." Participants are "assigned" (Social Services Law § 336–a) to various "work site[s]" (Social Services Law § 336–c), where they provide "valuable service" until they are able "to secure employment in the regular economy" (*see,* [WEP] Program Manual). While the agencies providing work assignment opportunities obviously employ some people, they are not "employing" Program participants (*see, Social Investigator Eligibles Assn. v. Taylor,* [268 N.Y. 233, 236–237, 197 N.E. 262 (1935)] [work relief participants are not subject to the Civil Service Law]). These agencies and entities simply do not pay a salary to the Program participants—one of the fundamental requisites that sparks the prevailing wage entitlement [in the New York State Constitution].

*Brukhman,* 94 N.Y.2d at 393, 395–96, 705 N.Y.S.2d at 561, 563, 727 N.E.2d 116. The *Brukhman* analysis is of course wholly consistent with PRWORA's goal of promoting employment. *See* 42 U.S.C. § 601(a)(2).

In any event, the outcome of this appeal should not hinge on whether a City agency is the "payor" of funds that come from the federal government and the State of New York and that are earmarked by them for the purpose of paying WEP participants—a hypertechnicality if there ever was one.[2]

## II.

Although "an employment relationship within the scope of Title VII can exist even when the putative employee receives no salary," *see Pietras,* 180 F.3d at 473, the usual compensation for work is wages. The majority emphasizes that the welfare benefits received by WEP participants equal the hours they work multiplied by the minimum wage, "an all too typical way of calculating compensation for work." Maj. Op. at 95–96. But the inference— that Temporary Assistance to Needy Families ("TANF") is wages—is unavailable; in *O'Connor,* we held that work study funding did not support an inference of employment even though the funding was calculated on the basis of the number of hours worked. 126 F.3d at 112 n. 2. The inference on which the majority relies is also blocked by statute:

> A penalty imposed by a State against the family of an individual by reason of the failure of the individual to comply with a requirement under the State program funded under this part *shall not be*

1. Presumably, the majority opinion is likewise limited (to Title VII), and "it would be foolhardy to assume" that it may be read to extend in other directions for other uses.

2. If designation of the "payor" is deemed critical, then (assuming that principle is conscientiously applied in the future) the various government agencies that conduct the WEP program could obviate the holding in this case by tinkering with who cuts the checks to welfare recipients.

*construed to be a reduction in any wage paid to the individual.*

42 U.S.C. § 608(c) (emphasis added).

The majority explains away this unambiguous command by saying that it "only makes sense" if welfare benefits are wages, maj. op. at 96, *i.e.*, that reduction in benefits could not be construed or misconstrued as a reduction in "any wage" unless it is a wage to begin with, and that "Congress could easily have said that the benefits at issue may not be considered wages." Maj. Op. at 95–96 The holding of the majority opinion is thus the offspring of a negative pregnant. Moreover, the inference drawn by the majority is defective. Section 608(c) refers to "any wage" (which may account for receipt of payments in excess of the welfare benefits by some WEP participants in private sector assignments), and Congress could easily have said "*the* wage" instead of "*any* wage" if (as the majority argues) the WEP benefits constitute wages. The majority has simply rejected the most natural and direct reading of the text; no wording can be framed by Congress to withstand an aggressive misreading.

I subscribe to the conclusion in *Brukhman:* "These agencies and entities simply do not pay a salary to the [Work Experience] Program participants . . . ." 94 N.Y.2d at 396, 705 N.Y.S.2d at 563, 727 N.E.2d 116.

Alternatively, the majority asserts that (even if TANF benefits are not wages) the carfare, child care and workers' compensation incidental to WEP participation suffice alone to constitute remuneration. *See* Majority op. at 92–93. This idea is refuted in the following two sections.

## III.

Our employment cases recognize that unpaid workers may nevertheless receive enough "direct or indirect economic remuneration" to be "hired" if certain of their benefits—those that are not merely incidental to the work—taken together, reach a sufficiently high level. *See, e.g., York,* 286 F.3d at 125–26; *Pietras,* 180 F.3d at 473.

In *York,* we dismissed a suit in which a lawyer working on committees of the Association of the Bar of the City of New York sued the Association under Title VII alleging sexual harassment. *York,* 286 F.3d at 123–124. We held that "in order to satisfy this Circuit's remuneration test," the plaintiff must show that the benefits received were (1) "sufficiently substantial" and (2) "not merely incidental to the activity performed." *Id.* at 126. York received the following benefits: (i) workspace, (ii) clerical support, (iii) publicity, (iv) tax deductions for nonreimbursable expenses, (v) networking opportunities, and (vi) reimbursement for out-of-pocket expenses. *Id.* at 124. We held that these things were both insubstantial and incidental as contrasted with "salary, vacation, sick pay, or benefits such as health insurance, disability insurance, life insurance, death benefits, and retirement pension, all of which primarily benefit the employee independently of the employer." *Id.* at 126.

In *Pietras,* a volunteer firefighter sued her department under Title VII, prevailing after a bench trial. On appeal, the fire department argued (for the first time) that she was not an employee under Title VII.[3] The "significant benefits" she cited "included: (1) a retirement pension, (2) life

---

**3.** *Pietras* styled this as a challenge to the district court's jurisdiction. *York,* 180 F.3d at 123–24. Prior and subsequent cases treat "employee" status as a merits rather than a jurisdictional question. *See, e.g., York,* 286 F.3d at 123 (affirming district court's ruling granting defendants' 12(b)(6) motion without discussion of jurisdiction).

insurance, (3) death benefits, (4) disability insurance, and (5) some medical benefits." *Id.* at 471, 473. Those benefits are of course among the ordinary, bargained-for emoluments of employment; the health and death benefits do not appear to have been limited to injury or death on the job; and all of these things "primarily benefit the employee independently of the employer." *York,* 286 F.3d at 126. Even so, we held only that the firefighter's status as a "hired person" was a "fact question [because she was] entitled to *significant* benefits." *Pietras,* 180 F.3d at 473 (emphasis added). In so doing, we relied heavily on *Haavistola v. Cmty. Fire Co.,* 6 F.3d 211 (4th Cir.1993), which held that disputed material facts precluded summary judgment on the question of whether a volunteer firefighter was an "employee" under Title VII. *See Pietras,* 180 F.3d at 473 (noting that the *O'Connor* court had distinguished *Haavistola* ).

The WEP benefits cited by the majority opinion (reviewed in Section IV below) do not even raise an issue of fact: they are wholly incidental to WEP participants' workfare assignments and they chiefly benefit the City. Such benefits cannot be deemed compensation in lieu of wages; no one needing gainful employment could work for such a package.

## IV

Viewed in light of *York, Pietras,* and *O'Connor,* it is clear that plaintiffs are not "employees" under Title VII. Plaintiffs cannot prevail if the benefits they received as WEP participants were *either* [A] "not sufficiently substantial" such that they amount to "compensation," *or* [B] "merely incidental to the activity performed." *York,* 286 F.3d at 126; *accord Pietras,* 180 F.3d at 473; *O'Connor,* 126 F.3d at 115–16. And their claims are insufficient on both counts.

## A

Benefits are "sufficiently substantial" only when they amount to a form of compensation. *See O'Connor,* 126 F.3d at 115–116 (" '[C]ompensation ... is an essential condition to the existence of an employer-employee relationship.' " (internal citation omitted)). WEP participants receive continued eligibility for their welfare benefits, limited workers' compensation benefits, and reimbursements for carfare to and from work and for child care during the working day. No doubt, WEP participants prefer to get transportation and child care benefits; but no one would think that such benefits amount to "compensation" for the work; they hardly would induce anyone to spend his day maintaining City parks.

Workers' compensation is chiefly a benefit for the employer: without it, WEP participants could sue the City for tort damages. *See U.S. v. Demko,* 385 U.S. 149, 152, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966) ("[W]here there is a compensation statute that reasonably and fairly covers a particular group of workers, it presumably is the exclusive remedy to protect that group."). True, the worker gets relief that is more sure and prompt, but that is no incremental advantage to WEP participants because their medical coverage would in any case be the responsibility of the government.

The majority opinion emphasizes that WEP participants must work in order to maintain their eligibility for welfare benefits. But such reliance on the receipt of governmental cash benefits runs afoul of *O'Connor* as well as 42 U.S.C. § 608(c), for reasons set forth in Section II of this opinion.

## B

Benefits can be tantamount to remuneration only if they are sufficiently "substan-

tial," in themselves or in tandem with a wage. The law therefore discounts benefits that are incidental to employment (*i.e.* benefits or accommodations that one needs only *because* one is working). Thus, noncash benefits that are "merely incidental to the activit[ies] performed" are not compensation. *York*, 286 F.3d at 126.

WEP participants receive: carfare, which ensures the attendance of participants at WEP assignments, scattered throughout the City; and child-care expense reimbursement, which is paid only while the participant is at work. The majority concedes that "child care and transportation expenses ... are payments that are necessary only because the recipient works." Maj. Op. at 95–96. Worker's compensation, which covers only workplace injuries, is similarly incidental.

No person seeking gainful employment would accept as full compensation the cost of getting to work plus insurance for on-the-job injury: thus, for example, a miner works for wages and benefits that profit the miner, not for rides on the mineshaft elevator, a head-lamp, and the canary.

### C

The majority opinion creates a circuit split; the only other circuit to consider the question now before us came out the other way. See *Johns v. Stewart*, 57 F.3d 1544, 1557–59 (10th Cir.1995) (holding that workfare participants were not employ-

ees). The majority opinion declines to follow *Johns* on a number of grounds, none persuasive.

First, the majority opinion notes that *Johns* was a case under the Fair Labor Standards Act ("FLSA"), not Title VII. See Maj. Op. at 94. The distinction proves too much, however, because the definition of "employee" in the FLSA is considerably more inclusive than the common law definition used in Title VII. See 29 U.S.C. §§ 203(g), (e) (defining "employ" under the FLSA as including "to suffer or permit to work" and "employee" as "any individual employed by an employer"); *Frankel v. Bally, Inc.*, 987 F.2d 86, 89 (2d Cir.1993) ("Title VII do[es] not contain the same expansive definition of the term 'employ' used in the FLSA."). The *Johns* analysis is therefore applicable *a fortiori*. Moreover, decisions in the FLSA context hold that individuals in programs designed to prepare them for employment are not employees, and thereby confirm that WEP participants are not employed.[4]

Second, the majority observes that the Department of Labor ("DOL"), the agency charged with interpreting the FLSA, has implicitly rejected *Johns*. Maj. Op. at 94. The apparent source of this purported rejection is a DOL "Guidance" in the form of questions and answers, which notes that "[w]elfare recipients would probably be considered employees [under FLSA] in

---

**4.** Even under the FLSA, "[a]n individual may work for a[n employer] and nevertheless not be an 'employee.'" *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 300 n. 21, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). In deciding whether individuals fall within the FLSA's broad definition of "employee," courts focus on the purpose of the program that is purported to create an employment relationship. Thus, a plaintiff who performed closely-supervised work nevertheless is not an employee under the "economic realities" test if the plaintiff's reason

for participating in the program is to further his own training or rehabilitation. See *Williams v. Strickland*, 87 F.3d 1064, 1067–68 (9th Cir.1996); cf. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 153, 67 S.Ct. 639, 91 L.Ed. 809 (1947) (holding that plaintiffs who performed work under close supervision were nevertheless not "employees" under the FLSA, but were instead more like students in school, since they received no direct remuneration but instead received training for a short period, after which some were offered jobs).

many, if not most, of the work activities described in the new welfare law." Similarly, the majority relies on a compliance manual promulgated by the EEOC-the agency charged with interpreting Title VII—to support its view that WEP participants are employees under 42 U.S.C. § 2000e(f). Maj. Op. at 94–95.

However, the majority concedes that a DOL guidance and an EEOC manual are entitled to no deference beyond their "power to persuade." [*Id.*] (quoting *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)). The (hedged) assertion in the DOL guidance is without an express or implied basis; it is unpersuasive because that which does not explain cannot persuade. Nor am I persuaded by the EEOC compliance manual; and it wouldn't matter if I were, because the EEOC's interpretation cannot be squared with our precedent in *O'Connor, Pietras*, and *York.*

Third, the majority opinion speculates that the *Johns* plaintiffs may not have "received the full range of benefits owing to WEP participants" and that they may not have been "required to perform useful work." Maj. Op. at 94. The phrase "full range of benefits" is an absurd misdescription; and the relevant passage in *Johns* gives no support to the majority's speculation about the nature of the benefits received or the work performed by the *Johns* plaintiffs:

> [a]lthough [the workfare] participants may perform the same functions as regular employees at some of the projects to which they are assigned, they differ from state employees in that they do not receive the same salary, safe working conditions, job security, career development, Social Security, pension rights, collective bargaining, or grievance procedures as do the actual employees.

*Johns*, 57 F.3d at 1559 (quoting *Klaips v. Bergland*, 715 F.2d 477, 483 (10th Cir. 1983)).

Finally, the majority opinion suggests that *Johns* rested on an "artificial dichotomy" between employment and WEP participation. *See* Maj. Op. at 94–95. According to the majority, this assumption runs afoul of our decision in *EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1539–40 (2d Cir.1996) (holding that plaintiffs, who were officers and directors of a corporation, could be employees in certain capacities even if they were not employees in other capacities). But the *Johns* court nowhere presumed that a welfare recipient could not be an employee; the *Johns* court stated—as a matter of fact, not presumption—that the workfare participants at issue were "completely unlike state employees in every respect." *Johns*, 57 F.3d at 1558–59. Further, the *Johns* court focused (as we must under *O'Connor, Pietras*, and *York* ) on whether the plaintiffs received compensation from their putative employer for the work they performed. *Id.* at 1558–59.

In short, here as in *Johns*, a person who cleans public parks or answers City phones to preserve welfare benefits is not working for wages, *see* 42 U.S.C. § 608(c); *O'Connor*, 126 F.3d at 116 n. 2, and is receiving no compensation even if the government picks up the person in the morning, drops her off at night, offers to watch her children (if any) during working hours, or provides her with work-clothes. The record in this case makes clear that, under our precedents, the benefits received by WEP participants are both [i] insubstantial and [ii] incidental to their workfare assignments. It follows that they have not been hired by the City of New York and they cannot be employees for the purposes of Title VII.

\*     \*     \*     \*     \*     \*

For the reasons stated above, I would affirm the district court's ruling that participants in New York City's WEP program are not "employees" under the common law meaning of that term incorporated into Title VII. I therefore would not reach the City's implied preemption arguments that are discussed and rejected in the majority opinion.