This opinion is uncorrected and subject to revision before publication in the New York Reports.
----------------------------------------------------------------

No. 139
In the Matter of Walter E. Carver,
            Respondent,
        v.
State of New York, et al.,
            Appellants.

            Valerie Figueredo, for appellants.
            Susan C. Antos, for respondent.
            National Center for Law and Economic Justice, amicus curiae.

LIPPMAN, Chief Judge:

        We hold that petitioner, who performed work for the City of New York in exchange for cash public assistance and food stamps, is protected by the federal minimum wage provisions of

- 1 -

the Fair Labor Standards Act (FLSA).

Petitioner Carver is a 69-year-old Vietnam War veteran who received public assistance from the City of New York, through the State-funded Safety Net Assistance Program (see Social Services Law §§ 61, 62, 157 et seq.), beginning in 1993 and continuing until March 2000.  During that time, the City required, in accordance with the Social Services Law (see Social Services Law §§ 335-b, 335-c), that he work 35 hours per week in the "Work Experience Program" (WEP) of the City's Human Resources Administration (HRA) in order to receive public assistance benefits.  HRA administers the State's public assistance programs for New York City, with oversight from the New York State Office of Temporary Disability Assistance (OTDA) (see generally Social Services Law § 61).

Carver was assigned to the mailroom of Coney Island Hospital where he sorted and delivered the mail.  In 1995, he was reassigned to the Manhattan Terminal of the Staten Island Ferry, where he would sweep the floors, spread salt in the winter and pick up trash.  In return for performing these services, Carver received $176 every two weeks, along with food stamps.  His cash compensation plus the food stamps equaled the minimum wage for the amount of hours that he worked.  If he missed work, his assistance was reduced.  Carver never received any training in how to perform these jobs, or participated in any vocational training classes during those years.  He participated in only one

week of classes, which concerned how to write a resume and look for a job at the end of the program.

In 2000, Carver was told that he would have to leave WEP, and on March 4, 2000, his benefits were terminated.  On August 10, 2007, Carver won $10,000 in the New York State Lottery.  The New York State Division of Lottery and the New York State Office of Temporary Disability Assistance (OTDA) invoked New York Social Services Law § 131-r, which authorizes the State to appropriate half of any lottery prize over $600 to "reimburse [itself] . . . for all . . . public assistance benefits paid to [the prizewinner] during the previous ten years."

In a letter dated September 27, 2007, Carver requested a review of OTDA's determination.  On January 8, 2008, OTDA notified Carver that it would not refund any of the $5,000.  Carver then filed the underlying CPLR article 78 proceeding in April 2008 against OTDA, among others, alleging that the interception of his lottery winnings violated his rights under the FLSA and the New York State Minimum Wage Act (Labor Law § 652).  Specifically, Carver contended that the OTDA required him to work 35 hours per week in order to receive public assistance benefits, and that his biweekly cash benefits, plus the value of the food stamps he received, equaled no more than the federal or New York State minimum wage.  Thus, were OTDA permitted to recoup a portion of the benefits paid to him through Social Services Law § 131-r, then Carver would be paid less than minimum wage, in

violation of the FLSA.  The defendants cross-moved, inter alia, to dismiss the petition pursuant to CPLR 3211 (a)(7).

Supreme Court granted the cross motion and dismissed the proceeding.  As relevant here, the court noted that the issue of whether WEP workers are deprived of minimum wage standards by the implementation of Social Services Law § 131-r is an issue of first impression.  The court stated that Carver implicitly agreed to "the statutory requirement of recoupment of previous public assistance monies [he] had received" because by purchasing the lottery ticket he "was subject to all of the rules, regulations and statutes with respect to that lottery ticket."  The court then stated that Carver's public assistance benefits were determined by "his household size, rent and other eligibility factors" under the Social Services Law, and not by the number of hours he worked per week in WEP.  Furthermore, the court determined that although the Social Services Law required Carver to engage in work activities "in return for [his public assistance] benefits," he was not an employee who earned wages because no "employer-employee relationship" existed "as no income tax W-2 statement was furnished to [him] or deductions made for FICA or Medicare taxes."  Finally, the court determined that Carver was "not a federally protected worker" as he was not an employee, and thus the federal minimum wage law does not apply to him.

The Appellate Division unanimously modified by

reinstating the FLSA cause of action against OTDA and its Commissioner and, as so modified, affirmed. The court stated that the State's interception of Carver's lottery prize winnings did not violate the State minimum wage law, which specifically exempts employees of "federal, state or municipal government or political subdivision thereof," but that it did violate the FLSA (Matter of Carver v State of New York, 87 AD3d 25 [2d Dept 2011]). Applying the "economic reality test," the Court concluded that individuals like Carver, who receive public assistance benefits and participate in WEP, are employees under the FLSA.

On remand, Supreme Court granted Carver's petition against OTDA and its Commissioner, and directed defendants to return his $5,000. The parties then entered into a Stipulation and Order of Contingent Settlement which resolved all outstanding issues, including attorney's fees.

This Court then granted OTDA leave to appeal from the Stipulation and Order of Contingent Settlement, bringing up for review the prior, nonfinal Appellate Division order. The sole issue on appeal is whether as a result of his participation in WEP as a condition of his receipt of public assistance benefits under Social Services Law § 336 (1)(d), Carver was entitled to minimum wages under the FLSA.

The FLSA was passed by Congress in 1938, "to lessen, so far as seemed then practicable, the distribution in commerce of

goods produced under subnormal labor conditions" and to eliminate low wages and long hours in an effort to "free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers" (Rutherford Food Corp. v McComb, 331 US 722, 727 [1947]).  The FLSA was also enacted to prevent unfair competition through the use of underpaid labor (see 29 USC § 202 [a] [3]).  The FLSA provides: "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the" rates set forth in the statute (29 USC § 206 [a]).  An "employee" is defined as "any individual employed by an employer" (29 USC § 203 [e][1]).  To "employ" is "to suffer or permit to work" (29 USC § 203 [5] [g]).  An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency" (29 USC § 203 [d]).  Although the FLSA does explicitly exempt certain employees from its purview, neither workfare nor public assistance recipients are included among those exemptions (see 29 USC § 213; Powell v United States Cartridge Co., 339 US 497, 517 [1950] [stating that FLSA's exemptions are "narrow and specific," and indicating that "[s]uch specificity in stating exemptions strengthens the implication that employees not thus exempted . . . remain within the Act"]).

To determine whether an individual qualifies as an employee under FLSA, we must look to the "economic reality," not the "technical concepts, of the relationship" (Goldberg v Whitaker House Cooperative, Inc., 366 US 28, 33 [1961]; Tony and Susan Alamo Foundation v Secretary of Labor, 471 US 290, 301 [1985]; see also Bartels v Birmingham, 332 US 126, 130 [1947]). More specifically,

> "[b]ecause [the FLSA] defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer. In answering that question, the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case. Under the 'economic reality' test, the relevant factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records"

(Herman v RSR Security Servs. Ltd., 172 F3d 132, 139 [2d Cir 1999], quoting Bonnette v California Health and Welfare Agency, 704 F2d 1465, 1470 [9th Cir 1983]; see Goldberg, 366 US at 33; Johns v Stewart, 57 F3d 1544, 1557 [10th Cir 1995] [stating that the economic reality test is the proper test to determine "the scope of employee coverage under" the FLSA]).

In Johns v Stewart (57 F3d 1544), the Tenth Circuit, applying the economic reality test, determined that workers in Utah's workforce program were not employees within the meaning of the FLSA. However, two years later, the United States Department

of Labor (DOL), the federal agency charged with enforcing the

FLSA, issued a guidance letter entitled "How Workplace Laws Apply

to Welfare Recipients," in which it undertook to explain, in

question-answer format, which federal worker-protection laws

applied to public assistance workers.  The letter states:

> "Do federal employment laws apply to welfare
> recipients participating in work activities
> under the new welfare law in the same manner
> they apply to other workers?
>
> "Yes.  Federal employment laws, such as the
> Fair Labor Standards Act [FLSA], the
> Occupational Safety and Health Act [OSHA],
> Unemployment Insurance [UI], and anti-
> discrimination laws apply to welfare
> recipients as they would apply to other
> workers.  The new welfare law does not exempt
> welfare recipients from these laws."

(DOL Guidance Letter, at 40).  According to the DOL, "welfare

recipients would probably be considered employees in many, if not

most, of the work activities described in the [federal public

assistance law]" (id.).  The FLSA charges the DOL with the duty

of administering and interpreting the FLSA.  Accordingly, the

DOL's interpretation of the FLSA is "entitled to considerable

weight in construing the Act" (Tony & Susan Alamo Foundation v

Secretary of Labor, 471 US 290, 297 [1985]).  A 1997 Conference

report (HR Rep No 105-217 [1997], at 934) leaves no doubt the

Congress was aware of and considered the DOL's guidelines and

accepted them, despite efforts to overturn DOL's interpretation

of the FLSA.[1]

To that end, we must apply the economic reality test and, under that test, the City should be considered Carver's employer. The City had the power to hire and fire WEP workers, in that it was the City's responsibility to assign public assistance recipients to a WEP agency and the City could dismiss workers from WEP based upon their performance. Additionally, the City and its WEP agencies supervise and control the work schedule of the workers. Furthermore, the City and its agencies, such as HRA, maintain the employment records of the WEP workers. While the Social Services Law, not the WEP agencies or the City, determines the rate and method of payment of WEP workers, that is simply one factor. The economic reality test "encompasses the totality of the circumstances" (Herman, 172 F3d at 139).

For example, in Alamo (471 US 209), the United States Supreme Court applied the economic reality test to determine if certain individuals were "employees" under the FLSA. The Alamo Foundation was a not-for-profit organization founded to "'establish, conduct and maintain an Evangelistic Church . . .

---

[1] The United States Department of Health and Human Services has also concluded that the FLSA applies to public assistance recipients under the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), also known as the "Welfare Reform Act" (see 45 CFR 260.35 ["Federal employment laws (such as the Fair Labor Standards Act [FLSA], the Occupational Safety and Health Act (OSHA) and unemployment insurance [UI]) and nondiscrimination laws . . . apply to [Temporary Assistance to Needy Families] beneficiaries in the same manner as they apply to other workers"]).

and generally to do those things needful for the promotion of Christian faith, virtue and charity.'"  It supported itself by operating gas stations, stores and other businesses staffed by "associates."  Associates "receive[d] no cash salaries, but the Foundation provide[d] them with food, clothing, shelter, and other benefits" (471 US at 292).

Noting that it "has consistently construed the [FLSA] 'liberally to apply to the furthest reaches consistent with congressional direction'" (id. at 296, quoting Mitchell v Lublin, McGaughy & Associates, 358 US 207, 211 [1959]), the Supreme Court found that the associates were employees" (Alamo, 471 US at 301, citing Goldberg, 366 US at 33).  The Court focused on three factors: (1) the associates received compensation, albeit "primarily in the form of benefits rather than cash," a distinction deemed "immaterial;" (2) they were "entirely dependent upon the Foundation for long periods, in some cases . . . years;" and (3) any other result would have undermined the purposes of the FLSA by giving the Foundation a competitive advantage and "exert[ing] . . . downward pressure on wages in competing businesses" (Alamo, 471 US at 301, 302).

The economic reality test, as applied in Alamo, compels the conclusion that Carver was an "employee" of the City.  The Staten Island Ferry is an enterprise similar to a privately owned ferry service or the gas stations and stores operated by the Foundation in Alamo.  Carver's work was no different from the

janitorial services performed by salaried City employees at many offices and other locations.  Like the associates in Alamo, Carver's benefits were "compensation," given in exchange for his work -- even if some of those benefits were not paid in cash -- and he was "entirely dependent" on those benefits for years.

Alamo also establishes that the employer's purposes and objectives are not relevant in determining a worker's status as an employee.  The State argues that WEP workers are not employees because its declared goal is to prepare WEP workers for gainful employment.  However, this appears to be no different from the Foundation's goals of Christian ministry.  Had Carver spent most of his hours receiving training, or education in how to obtain employment outside of the WEP program, we might have reached a different conclusion.  As the DOL stated, "individuals engaged in activities such as vocational education, job search assistance, and secondary school attendance," are likely exempt from the FLSA "because these programs are not ordinarily considered employment under the FLSA" (DOL Guidance Letter, at 40).  However, based on the record before us, Carver spent his full-time hours doing work for the City.  The dissent's likening of Carver's 7-year, 35-hour-work-week engagement through WEP to perform services typical of any other non-WEP employee, to that of a "student or trainee" patently ignores the economic reality of Carver's situation (see dissenting op. at 14).  Moreover, contrary to the dissent's contention, the policies supporting the passage of the FLSA do

weigh in favor of finding coverage here.  Were the City permitted to hire and engage WEP workers for less than minimum wage, they could effectively suppress the market and impede the FLSA's goal of eliminating unfair competition though the use of underpaid labor.

Furthermore, in United States v City of New York (359 F3d 83 [2d Cir 2004]), the Second Circuit determined that public assistance recipients obliged to participate in WEP are employees within the meaning of Title VII of the Civil Rights Act of 1964, and were thus entitled to Title VII's protection against sexual and racial harassment (id. at 86-87).  The Court determined that (1) the receipt of cash payments and food stamps, which equaled the minimum wage times the number of hours the WEP workers worked; and (2) the fact that a plaintiff who "refused to work would lose the portion of the family's grant attributable to her . . . results in the conclusion that [the plaintiffs] were employees" (id. at 92).  Although the FLSA was not the focus of the case in City of New York, the Second Circuit distinguished Johns and stated that even with respect to the FLSA, "the [DOL], the agency charged with interpreting . . . the FLSA, has rejected the Johns approach" (id. at 94).

Following City of New York, two New York federal District Courts have applied the same reasoning to cases involving minimum wage violation claims by public assistance recipients participating in WEP, holding that they were employees

(see Elwell v Weiss, 2007 WL 2994308, 2006 US Dist LEXIS 96934
[WD NY, Sep 29, 2006, No. 03-CV-6121]; Stone v McGowan, 308 F
Supp 2d 79 [ND NY 2004]).  Accordingly, as the law stands today,
Carver is correct in asserting that he was an "employee" of the
City under the FLSA when he participated in the WEP program.

It is true that, in Brukhman v Giuliani (94 NY2d 387
[2000]), this Court, holding that the plaintiffs did not qualify
for a prevailing wage, stated that WEP "workers simply are not in
the employ of anyone" (id. at 395-396).  This Court, however,
expressly limited the opinion, stating "we decide no more than is
before us" (id. at 397 [limiting its holding to apply to the
requirements of the New York Constitution's wage provision]).
Here, the Appellate Division rejected the State's reliance on
Brukhman because this Court did not apply the economic reality
test, which, under federal law, is the applicable test for
determining who is an employer under the FLSA.  Additionally,
Brukhman is distinguishable from this case because the plaintiffs
there argued that they should have been paid at the prevailing
State wage for their participation in WEP, whereas Carver's claim
is under the FLSA's minimum wage standards.  Quite simply, we are
now confronted with an issue of federal law.[2]  The Supreme Court

---

[2] It is mystifying why, on a question of federal law, the
dissent feels compelled to follow a Tenth Circuit decision
predating the adoption of PRWORA and to amplify the import of
Brukhman, while castigating the more recent teaching of the
Second Circuit and the guidelines of the Labor Department (see
dissenting op. at 2-3, 20-22, 22-23 n 6).

has made clear that the FLSA, which "defines the verb 'employ' expansively to mean 'suffer or permit to work,' (52 Stat. 1060, § 3, codified at 29 U.S.C. §§ 203(e), (g)" has "striking breadth" and "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles" (Nationwide Mut. Ins. Co. v Darden, 503 US 318, 326 [1992]; see Rutherford Food Corp., 331 US at 728-729).  Thus, Brukhman is not controlling here.

The State contends that WEP workers cannot be employees because their assistance depends on "economic need," measured by "specific household expenses," and on "household size," rather than on the type of work done or the workers' skill.  There is no reason, however, why the formula used to set a worker's pay should affect whether or not he is an employee.  As the United States Supreme Court stated in Alamo, what matters under the FLSA is that, like Carver, the associates expected to receive in-kind benefits in exchange for services and were dependent upon those benefits (471 US at 301).

The State also relies on language in the State laws and regulations and the City's Employment Process Manual stating that "the monetary grant . . . [for] participating in work-experience activities is not a wage for the performance of such activities" (and see 18 NYCRR § 385.9 [a][4]).  Such State law provisions, however, cannot override the FLSA.  To the extent that any state or city laws come into conflict with governing provisions of the

FLSA, they are preempted (Matter of People v Applied Card Sys.,
Inc., 11 NY3d 105, 113 [2008]).

Finally, the State attempts to sidestep two key factors
which indicate that WEP workers can be employees.  First, the
State contends that WEP workers' right to workers' compensation
benefits "has little if any significance" because volunteers also
have limited rights to such benefits.  Carver, however, is no
volunteer.  He worked full-time in the WEP program because he had
to if he wanted to receive his needed benefits.  Second, the
State argues that the work performed by Carver does not have true
monetary value because a WEP worker cannot replace the job of an
actual State employee.  However, regardless of whether Carver's
duties and responsibilities were identical to that of a non-WEP
State worker, he qualifies as an employee under the economic
realities test for FLSA purposes.

The gist of Carver's argument is that he is entitled to
minimum wage for his hours worked as a participant in the WEP
program, and that the State cannot retroactively deprive him of a
minimum wage by recouping the funds through his lottery prize.
Carver's request is actually consistent with the current
practice.  As mandated by Social Services Law § 336-c (2)(b):

> "[t]he number of hours a participant in work
> experience activities authorized pursuant to
> this section shall be required to work in
> such assignment shall not exceed a number
> which equals the amount of assistance payable
> with respect to such individual (inclusive of
> the value of food stamps received by such
> individual, if any) divided by the higher of

> (a) the federal minimum wage provided that
> such hours shall be limited as set forth in
> subdivision four of section three hundred
> thirty-six of this title, or (b) the state
> minimum wage."

Carver's particular situation compels the conclusion that he is entitled to minimum wage.  While participating in the WEP program, Carver worked 35 hours per week, and the State concedes that this is not the norm.  Additionally, the State's actions here led to a particularly unfair result in that Carver was taxed on the full amount of his $10,000 lottery winnings, while being forced to surrender half of those winnings to the State.

Accordingly, the judgment of the Supreme Court appealed from and the order of the Appellate Division insofar as sought to be reviewed, should be affirmed, without costs.

Matter of Walter E. Carver v State of New York et al.

No. 139

ABDUS-SALAAM, J.(dissenting):

The majority holds that petitioner Walter E. Carver, who received government assistance under the City of New York's work experience program ("WEP"), was an "employee" of the City within the meaning of the federal Fair Labor Standards Act ("FLSA") (see 29 USC §§ 201 et seq.), and that therefore the minimum wage provisions of that statute entitle him to withhold a portion of his lottery winnings that would otherwise be owed to the New York State Office of Temporary and Disability Assistance ("OTDA") pursuant to Social Services Law § 131-r.  Tellingly, the majority does not dispute that FLSA and the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") (see Pub L 104-193) do not expressly declare that public assistance recipients who must meet work requirements are employees of the government for FLSA purposes.  Nor does the majority contend that the legislative history of those statutes reveals that Congress viewed petitioner and other such public assistance or "workfare" recipients as government "employees" who could obtain the benefits of FLSA.  Rather, in the absence of clear textual or historical support for its conclusion that WEP participants are City "employees" within the meaning of FLSA, the

- 1 -

majority maintains that an evaluation of petitioner's relationship with the City under the "economic reality" test, which the United States Supreme Court has adopted to determine whether an individual is the type of "employee" that Congress meant to protect via FLSA (see Goldberg v Whitaker House Cooperative, Inc., 366 US 28, 33 [1961]), reveals that he is protected by FLSA.

However, while courts should employ the economic reality test to ensure FLSA coverage for the broad class of individuals whom Congress truly meant to protect under the statute, the test cannot be used as a mere device to skip over the glaring lack of any legislative support for the extension of the statute's minimum wage provisions to public assistance or workfare recipients. Indeed, the economic reality test "does have its limits," and chief among them is the principle that the application of the test must be "consistent with congressional direction" (Tony & Susan Alamo Foundation v Secretary of Labor, 471 US 290, 295-296 [1985], quoting Mitchell v Lublin, McGaughy & Associates, 358 US 207, 211 [1959]). Consonant with that most important limitation, the United States Court of Appeals for the Tenth Circuit has concluded that Congress did not intend to confer the protections of FLSA upon public assistance recipients simply because those individuals must meet certain conditions and engage in work activities in order to continue receiving government benefits (see Johns v Stewart, 57 F3d 1544, 1558 [10th

Cir 1995]).  Thus, as the Tenth Circuit's analysis demonstrates, and as the text and history of the relevant statutes show, petitioner and other similarly situated individuals are not "employees" within the meaning of FLSA, but instead receive government benefits in exchange for performing tasks relevant to the goals of PRWORA.  Because the majority's contrary holding runs afoul of that persuasive authority and does not comport with any sort of reality, economic or otherwise, I respectfully dissent.

I.

The text and history of FLSA and PRWORA refute the majority's conclusion that, in enacting those statutes, Congress placed local governments and beneficiaries of government assistance in an employee-employer relationship that falls within the scope of FLSA.  Regarding FLSA, that statute establishes, among other things, a minimum wage and a maximum number of work hours for any covered "employee," and the statute unhelpfully defines that critical term as "any individual employed" -- that is, "suffer[ed] or permit[ted] to work" -- by "an employer" (29 USC §§ 203 [e] [1]; 203 [g]; see 29 USC §§ 206 [a] [1]; 207 [a]).  In adding context to the vague term "employee," the statute specifies that some people who perform work for the government are protected "employees," but, significantly, it does not list public assistance recipients among them; rather, the statute lists a variety of traditional government positions which would

entitle their occupants to the protections of FLSA, and nothing on that list mentions, applies to, or describes public assistance recipients in a manner that would qualify them as statutory "employees" (see 29 USC §§ 203 [e] [2] [A] - [e] [2] [C]).  In fact, the statute does not refer to the recipients of government assistance at all, belying the majority's contention that the statute sets the wages and working conditions of those to whom the government gives benefits in exchange for their satisfaction of work-related requirements.

Nor does it seem that Congress had recipients of government benefits in mind when it passed and then amended FLSA over the years, for Congress appears to have focused primarily on rooting out abusive labor practices in traditional employment relationships established by commercial enterprises and their non-profit or governmental equivalents.  In its official declaration of the policy behind FLSA and its amendments, Congress expressed concern that "industries engaged in commerce or in the production of goods for commerce" had established "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," which conditions were harmful to, and spread via the abuse of, interstate commerce (29 USC § 202 [a] [emphases added]).  As a result, FLSA made it the policy of the federal government "to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries

without substantially curtailing employment or earning power" (29 USC § 202 [b] [emphasis added]).

Upon the initial passage of FLSA in 1938, President Roosevelt likewise suggested that FLSA was intended to address the abuse of laborers who had been hired by commercial enterprises to produce goods in exchange for a wage, rather than assistance recipients, for he described FLSA as necessary legislation to combat "the evil of child labor" and "the exploitation of unorganized labor," which were incompatible with [e]nlightened business" and would allow "[g]oods produced under conditions which do not meet rudimentary standards of decency" to "pollute the channels of interstate trade" (HR Rep 93-913 at 2818 [1974] [quoting the 1938 speech without attribution]). Subsequent amendments to FLSA also reflected Congress's desire to protect traditional commercial workers, not public assistance recipients, as Congress increased the minimum wage and expanded FLSA's coverage to student workers, retail workers and domestic service workers (see 88 Stat 62; HR Rep 93-913). Along those lines, upon debating the 1974 amendments to FLSA, Senators did not once mention public assistance recipients or similar individuals, instead focusing on the plight of child laborers on farms, domestic workers, firemen and the like (see 120 Cong Rec S4691-4702 [daily ed March 28, 1974] at 43-45).

Even when congressional reports condemned those who sought to use misleading labels or hidden arrangements to

disguise the type of employer-employee relationship to which FLSA would obviously apply, they did not make any reference to public assistance recipients, either in general or in the context of state programs that feature work-related requirements for the acquisition of assistance.  Instead, Congress sought to remedy situations where commercial employers established labor arrangements with students and minors, who would otherwise be covered by the statute, and yet improperly tried to hide the true nature of those employer-employee relationships to avoid complying with the statute (see 120 Cong Rec S4691-4702 [daily ed March 28, 1974] at 37-42).  Therefore, the text and history of FLSA reveal that, in general, the statute covers only ordinary wage earners hired by private and public employers to send goods and provide services via the channels of interstate commerce, and that public assistance beneficiaries are not covered.

In the same vein, PRWORA does not apply the provisions of FLSA to participants in workfare programs administered under the statute.  Although PRWORA does expressly grant the protections of some other federal statutes to participants in programs funded pursuant to that law, FLSA is not among them (see 42 USC § 608 [d]; Pub L 104-193, tit IV, § 408 [c]), and consequently, PRWORA does not bring workfare recipients within the ambit of FLSA.  In fact, PRWORA distinguishes between workfare participants and the sort of "employees" who might qualify for the protections of FLSA in several notable ways.

In that regard, while PRWORA compels individuals receiving temporary assistance for needy families to "participat[e] in work activities," such as unsubsidized employment, subsidized employment, job training or work experience (42 USC §§ 607 [d] - [d] [12]; Pub L 104-193, tit IV, §§ 407 [d] - [d] [12]), the Act does not treat this "work activities" requirement as some form of public sector employment that might trigger the provisions of FLSA. PRWORA neither labels program participants as "employees" nor the state as their "employer," and it contains measures crafted to place program participants in actual "employment" in the private sector, as distinct from the participants' existing positions as the recipients of government benefits (see e.g. 42 USC § 604 [f] [allowing states to use PRWORA funds to pay for agencies that provide "employment placement services" to people who are not employees but rather are "individuals who receive assistance under the State program funded under this part"]; 42 USC § 608 [b] [2] [A] [i] [states must prepare individual responsibility plan that "sets forth an employment goal for the individual and a plan for moving the individual immediately into private sector employment"]; 42 USC § 607 [d] [4] ["work experience" in repairing public housing and similar roles qualifies as requisite "work activities" only "if sufficient private sector employment is not available"]; Pub L 104-93, tit IV, § 404 [f]; Pub L 104-193, tit IV, § 408 [b] [2] [A] [i]; Pub L 104-193, tit IV, § 407

[d] [4]).  In addition, PRWORA refers to payments to program participants as "assistance" (see 42 USC §§ 604 [f]; 607 [e]) or "benefits" (42 USC § 601 [a] [2]) rather than wages paid to an employee, and in imposing a penalty upon any participant who fails to meet the mandatory work requirements, the statute declares that such a penalty "shall not be construed to be a reduction in any wage paid to the individual" (42 USC § 608 [c] [emphases added]; see Pub L 104-193, tit IV, § 408 [c]), thereby clarifying that participants are not employees who receive a wage from the government.

Moreover, the application of FLSA's minimum wage, overtime and other provisions to workfare participants is incompatible with PRWORA's primary goal of moving people off the public assistance rolls and into unsubsidized regular jobs, instead of making public assistance recipients state "employees" who are guaranteed a minimum wage subsidized by the federal government.[1]  As the Act's official statement of purpose puts it, PRWORA is meant to "increase the flexibility of States in operating a program designed to . . . end the dependence of needy parents on government benefits by promoting job preparation, work and marriage" (42 USC §§ 601 [a] - [a] [2]; see PL 104-193, §§

---

[1]  In passing similar legislation prior to PWRORA, the New York Legislature also expressed a desire to reduce the number of public assistance recipients in the State and encourage them to transition to genuine full-time employment in the private sector (see generally Bill Jacket, L 1990, ch 453; see also Bill Jacket, L 1997, ch 436).

401 [a] - [a] [2]), and thus, Congress could not have intended to limit states' flexibility in cutting benefits and incentivizing departure from the public assistance rolls by forcing the states to guarantee beneficiaries assistance in the amounts of the minimum wages specified by FLSA.  Indeed, far from seeking to make a generous offer of state "employment" to workfare participants at a "wage" equivalent to FLSA's minimum wage, the House members who supported PRWORA bemoaned the fact that, prior to the Act's passage, public assistance recipients were allegedly receiving benefits in excessive amounts far greater than the salary of many regularly employed individuals, and they wished to make the new workfare programs less generous, not more, than the sort of ordinary employment to which FLSA's minimum wage provisions would apply (see House Committee on the Budget Rep on HR 3734 of 1996 at 4).  In short, the express terms of FLSA and PRWORA do not apply FLSA's protections to workfare recipients, and Congress plainly intended to establish the kind of arrangement between the government and workfare beneficiaries that would remove them from the ambit of FLSA.

## II.

The majority does not seriously contest the clear evidence that Congress had no intention of turning participants in PRWORA programs into government "employees" covered by FLSA, but it insists that WEP participants qualify as government "employees" within the meaning of FLSA under the economic reality

test (see majority op. at 8-15).  However, where, as here,
Congress's intent to exempt a class of individuals from the reach
of FLSA is plain from the text and history of relevant statutes,
the judge-made economic reality test cannot serve to confer
FLSA's protections upon those who Congress thought should not
receive the statute's benefits because, as previously noted, a
court must apply the test in a manner consistent with Congress's
intent (see Tony & Susan Alamo Foundation, 471 US at 295-296; cf.
O'Connor v Davis, 126 F3d 112, 115 [2d Cir 1997]).  Indeed, as
will be explained herein, when the economic reality test is
properly applied in light of the legislative scheme, it leads to
the inescapable conclusion that petitioner is not a City
"employee" for FLSA purposes.

                              A.

        The Supreme Court has not exhaustively defined the
parameters of the economic reality test or set forth any
particular list of factors to be considered in every case.
However, the Court has indicated that one must look at "the
circumstances of the whole activity" of the parties to discern
the economic reality of a person's status under FLSA (Rutherford
Food Corp. v McComb, 331 US 722, 730 [1947]).  In conducting that
practical and comprehensive analysis, the Supreme Court has
focused on the individual's expectation of wages or in-kind
remuneration beyond what one might expect as a trainee or student
(see Tony & Susan Alamo Foundation, 471 US at 299-300; Walling v

Portland Terminal Co., 330 US 148, 150-153 [1947]), the
employer's ability to "expel [workers] for substandard work or
for failure to obey [workplace rules]" (Goldberg, 366 US at 33),
and the employer's arrangement of its enterprise as a "device"
which is "transparent[ly]" designed to evade FLSA's strictures
(id.).  Similarly, the United States Courts of Appeals have
attempted to distill the Supreme Court's precedents and
Department of Labor regulations regarding the economic reality
test into a multi-factor framework, concluding that "the relevant
factors include 'whether the alleged employer (1) had the power
to hire and fire the employees, (2) supervised and controlled
employee work schedules or conditions of employment, (3)
determined the rate and method of payment, and (4) maintained
employment records.'" (Herman v RSR Sec. Servs., 172 F3d 132, 139
[2d Cir 1999], quoting Bonnette v California Health & Welfare
Agency, 704 F2d 1465, 1469 [9th Cir 1983]; see also Hodgson v
Griffin & Brand, Inc., 471 F2d 235, 237-238 [5th Cir 1973]).

        In Johns v Stewart (57 F3d at 1544), the Tenth Circuit
concluded that, under the economic reality test, workfare
participants in Utah were not the State's "employees" for FLSA
purposes (see id. at 1556-1559).  The court determined that,
because the workfare participants had to meet financial, training
and other criteria beyond the performance of work in order to
receive benefits, the participants were not receiving benefits as
a form of wage solely in exchange for work, and in light of the

unusual tax and payroll treatment of the participants' benefits
payments, Utah had not established a typical employment
relationship with those individuals (see id. at 1558-1559).
While the court recognized that not every aspect of the workfare
program differed from employment, the court eschewed reliance on
such isolated factors or any rigid application of a multi-factor
test, instead following "the Supreme Court's direction to focus
upon the circumstances of the whole activity and the economic
reality of the relationship" (id. at 1559).  Thus, observing that
"[t]he work component of [Utah's workfare programs] [wa]s just
one requirement of the comprehensive assistance programs," the
court concluded that, under the circumstances of the whole
activity of the State and the beneficiaries, "[t]he overall
nature of the relationship between [the workfare participants]
and [the State] [wa]s assistance, not employment" (id. at 1558).

Johns persuasively shows that a workfare participant
generally cannot avail him- or herself of FLSA's minimum wage
specifications.  As Johns recognizes, under most workfare
programs, a state does not hire, fire and supervise employees or
pay them a wage in a traditional sense, but instead makes public
assistance beneficiaries meet many different criteria, such as
financial, family-related and work requirements, to obtain
government assistance and job training so that they can
transition into actual employment in the public or private
sector.  In addition, Johns makes the commonsense point that "the

circumstances of the whole activity" of workfare participants and the government are fundamentally different from those of employers and employees whose relationship is governed by FLSA, notwithstanding that the two arrangements may share some "isolated factors" in common (Rutherford Food Corp., 331 US at 730).[2]

Under the rationale of Johns and the relevant considerations identified by the Supreme Court and the lower federal courts, petitioner here was not an "employee" of the City and hence was not entitled to collect a minimum wage under FLSA. In particular, the City did not have the power to "hire" petitioner to fill an existing position left vacant by layoffs or other circumstances, as the law specifically forbids the City to replace an actual City employee with a WEP participant (see Social Services Law § 336-c [2] [e]; 42 USC § 607 [f] [2]).  And, although the City had the power to reduce petitioner's benefits based on his complete failure to participate in work activities (see Social Services Law §§ 131 [5]; 336), the City could not "fire" him in the sense of "expelling" him from the program based solely on "substandard work or for failure to obey [workplace rules]," as opposed to a complete refusal to work (Goldberg, 366

---

[2]  To be sure, Johns pre-dates PRWORA, but that is of no moment because, as explained above, PRWORA actually strengthens the rationale of Johns by revealing Congress's intent to place workfare participants in a very different position than that of an "employee" under FLSA.

US at 33).

        Furthermore, petitioner could not have had any
expectation of remuneration of the kind that would make him a
City "employee," as he was more akin to a student or trainee who
trained for full-time employment in the ordinary workforce by
engaging in work activities as one of the conditions of receiving
government assistance (see Walling, 330 US at 150-153).  Indeed,
both federal and New York law establish the clear expectation and
reality that petitioner was not earning a wage in exchange for
his work because the law declares that his benefits were not the
equivalent of wages (see 42 USC § 608 [c]; 18 NYCRR § 385.9 [a]
[4]; see also 42 USC §§ 604 [f]; 607 [e]), and the amount of his
benefits was not only based on the number of hours he worked, but
also on his needs and family size, which were matters unrelated
to his work activities (see Social Security Law §§ 131 [4],
131-a).[3]  Moreover, the City did not structure the WEP program as
a "device" to skirt FLSA's requirements and flood the channels of
interstate commerce with goods and services unfairly generated at
below-market rates in substandard labor conditions (Goldberg, 366
US at 33).  Instead, the City makes petitioner and other WEP
participants perform job-related tasks in order to develop

_____

        [3]  In fact, unlike wages that can be freely spent by an
employee and taxed by the government, state and federal law place
significant restrictions on the taxation and expenditure of
workfare benefits (see 42 USC § [a] [12] [A]; 18 NYCRR 381.1; see
also 20 CFR 416.1124 [c] [2]; IRS Publication No. 525: Taxable
& Nontaxable Income [1995–2013 eds.]).

valuable skills for their planned departure from the program and entry into genuine employment.

B.

The majority posits that, since petitioner did not learn any skills in a classroom or participate in a formal and systematic apprenticeship, the City used its professed desire to train and educate petitioner as a charade to disguise an ordinary employment situation subject to FLSA requirements (see majority op. at 10-11). However, petitioner's work experience in a professional setting was no less educational than the process of obtaining job skills via class work. By taking part in the WEP program, petitioner learned how to meet workplace expectations such as timely arrival at a job site, how to interact productively with colleagues, and how to complete his assignments properly -- among the most essential and universal job skills. In fact, petitioner's hands-on training may have been more valuable to him than any academic discourse on professional development.

The majority also believes that, because the Social Services Law calculates a WEP participant's work hours by dividing the amount of his or her benefits by the minimum wage (see Social Security Law § 336-c [2] [b]), the statute deems a WEP participant's benefits to be wages, akin to the minimum wage, which must be paid as part of an employer-employee relationship covered by FLSA (see majority op. at 8). But the New York

statute's use of the minimum wage as a numerical factor to be considered in setting the work hours of WEP participants does not remotely indicate that WEP benefits are wages or that the Legislature meant to give participants the minimum wage.  To the contrary, the Legislature may have simply sought to use the number of hours that a minimum wage earner might work in exchange for a particular amount of money as a convenient pre-existing benchmark of a standard, fair number of working hours for WEP participants, who need to adjust to such conditions that prevail in the regular workforce which they hope to enter.  Surely, the Legislature did not transform WEP participants into government employees by choosing the expedient of a maximum hours formula based on a familiar metric of appropriate working conditions, rather than inventing a new formula from scratch.  Beyond that, as the majority concedes (see majority op. at 9), this statutory formula weighs against a finding that petitioner was a City "employee" under FLSA because the statute, and not the City, "determined the rate and method of payment" of petitioner's benefits (Herman, 172 F3d at 139 [internal quotation marks omitted]).

The majority insists that WEP is akin to the thinly disguised commercial enterprise at issue in Tony & Susan Alamo Foundation v Secretary of Labor (471 US at 290), which enterprise was found by the Supreme Court to be subject to FLSA (see id. at 295-303).  But, that case is readily distinguishable from the one

before us.  In Tony & Susan Alamo Foundation, a non-profit organization with an avowed religious purpose operated a plethora of "commercial businesses, which include[d] service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and companies engaged in the production and distribution of candy" (id. at 292).  The workers at those businesses, called "associates," were needy, homeless or drug-addicted individuals ostensibly aided and rehabilitated by the organization (id.).  The organization gave the associates in-kind benefits, but not cash, in return for their labors (see id.).  The Secretary of Labor commenced a regulatory action against the organization, asserting that, among other things, it "employed" the associates within the meaning of FLSA and yet had not complied with FLSA's minimum wage and overtime provisions (see id. at 293).  The organization countered that: it was not an "enterprise engaged in commerce" to which FLSA applied; FLSA coverage would violate its rights under the Free Exercise Clause of the First Amendment; and it was exempt from FLSA's strictures because the associates were "volunteers," not "employees" within the meaning of FLSA (id. at 293-295).

The Supreme Court held that the organization had to comply with FLSA (see id. at 293-295, 299-303, 306).  First, the Court concluded that, because the lower courts had appropriately found that the organization ran commercial enterprises in

competition with other ordinary businesses, the organization was a "commercial enterprise" subject to FLSA (see id. at 295-299). Noting that it had "consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction," the Court determined that neither the organization's expressed religious purpose nor its offer of services and food to the associates removed it from the ambit of the statute because both formal Department of Labor regulations and federal judicial decisions had established that the religious or charitable nature of an otherwise commercial enterprise did not serve to remove it from the reach of the statute (id. at 296-299 [internal quotation marks and citation omitted]). Importantly, the Court observed that "[t]he legislative history of the Act support[ed] this administrative and judicial gloss," and the Court relied on extensive legislative history showing that Congress intended to regulate enterprises like the organization under FLSA (id. at 297-298).

Furthermore, in the Court's view, the organization's associates were "employees" under FLSA based on the overall economic reality of their relationship with the organization (see id. at 299-303). The Court noted that, unlike students or trainees, the associates "must have expected to receive in-kind benefits -- and expected them in exchange for their services" such that those benefits were "wages in another form" (id. at 301 [emphasis added]). In addition to that expectation of wages, the

Court relied on a number of factors that supported its determination that the associates were statutory "employees," including their many years of service and near-total dependency on the organization, their long work hours, their payment "on a 'commission' basis," and their having been "'fined'" severely "for poor job performance" (id. at 301 n 22).  Furthermore, the Court rejected the notion that the associates could opt out of the statute's coverage, declaring that a supposedly voluntary waiver of the statute's protections would undermine the statute's goal by ultimately driving down "wages" in "competing businesses" (id. at 302).  Finally, the Court rebuffed the organization's First Amendment argument and held that the associates could receive the protections of FLSA (see id. at 303-306).

Unlike the enterprise at issue in Tony & Susan Alamo Foundation, WEP is not the sort of commercial enterprise that FLSA seeks to regulate, as WEP does not compete with other businesses in the production of goods or supply of services in the channels of interstate commerce.  And, as discussed, WEP participants like petitioner are not employees of the City because, while they may expect to obtain government assistance upon meeting a combination of work-related and other criteria, they do not expect those benefits solely "in exchange for their services" (id. at 301), as did the associates in Tony & Susan Alamo Foundation.  Furthermore, although the City may penalize WEP participants for failure to meet minimal requirements of

attendance and hours at work, the City does not, unlike the organization in Tony & Susan Alamo Foundation, reward or punish participants based on the quality of their work, as an ordinary commercial employer might, by giving them benefits on a "'commission' basis" or "'fin[ing]'" [them] heavily for poor job performance" (id. at 301 n 22).  More fundamentally, in Tony & Susan Alamo Foundation, the text and history of FLSA supported the conclusion that the entity in question had to comply with FLSA, whereas those authorities support the opposite conclusion here.  It is not surprising, then, that the Tenth Circuit in Johns observed that Tony & Susan Alamo Foundation was fully consistent with the conclusion that workfare participants cannot obtain the protections of FLSA (see Johns, 57 F3d at 1557, citing Tony & Susan Alamo Foundation, 471 US at 295).

The majority's reliance on a Department of Labor document expressing the view that workfare recipients are "employees" within the meaning of FLSA is equally misplaced (see majority op. at 8).  While the Department of Labor's views are entitled to significant consideration based on its role as the agency charged with administering FLSA (see Tony & Susan Alamo Foundation, 471 US at 297), the deference owed to the agency's interpretation of the statute depends primarily on its "power to persuade" (Christensen v Harris County, 529 US 576, 587 [2000]), and in this instance, the persuasive power of the Department's document pales in comparison to the clear language, history and

case law demonstrating that workfare participants are not government employees.[4]  So, too, administrative guidance carries considerably less weight where, as here, it comes in the form of a document that has not been issued as "a formal adjudication or notice-and-comment rulemaking" (id.).[5]

United States v City of New York (359 F3d 83 [2d Cir 2004]), cited by the majority (see majority op. at 11-12), is inapposite.  There, the Second Circuit held that WEP participants are covered by Title VII of the Civil Rights Act of 1964 (see id. at 86-87), and in dictum, the court signaled that it might

---

[4]  Citing a Congressional conference report on 1997 budget legislation, the majority claims that Congress "considered the DOL's guidelines and accepted them" (majority op. at 8).  But, in the cited report, Congress merely mentioned the existence of the Department's opinion on the subject of FLSA coverage for workfare participants, noted the House's view that workfare participants were not entitled to wages or a salary in any traditional sense, and declined to pass any legislation addressing that specific issue (see HR Rep No 105-217 [1997] at 434).  Congress certainly did not agree to enact the Department's guidance on this issue into law, and its failure to invalidate the Department's document, unlike the failure to overrule a binding Supreme Court decision on the subject, is hardly a sign that the agency's guidance has become the law of the land.

[5]  As the majority observes (see majority op. at 8 n 1), the Department of Health and Human Services has issued a formal regulation indicating that participants in programs governed by PRWORA are protected by FLSA (see 45 CFR 260.35).  But, the Department of Health and Human Services is charged with joint responsibility for interpreting PRWORA, not FLSA, and hence its opinion on the meaning of FLSA is entitled to even less respect than that of the Department of Labor.  In any event, as previously noted, the views of administrative agencies simply cannot override the text, history and judicial interpretations of FLSA.

endorse the Department of Labor's view that FLSA covers workfare participants (see id. at 94).  Obviously, the dictum in City of New York does not supply binding authority on the issue at hand, nor is it even persuasive, as it merely restates the Department of Labor's informal guidance without supplying significant analysis of the text and history of FLSA and PRWORA relating to this issue.  In addition, while Title VII, like FLSA, is not among the statutes explicitly referenced by PRWORA, the Second Circuit's determination that Title VII nonetheless applies to workfare participants does not compel a similar conclusion with respect to FLSA.  After all, some provisions of PRWORA reflect Congress's desire to administer workfare programs on a non-discriminatory basis (see e.g. 42 USC § 608 [d]), and as a result, the application of Title VII protections to workfare participants would not offend against the legislative intent behind PRWORA in the same manner as the coverage of such individuals under FLSA.  Indeed, given Congress's broad desire to ensure that all assistance recipients would receive the job skills they needed via work experience programs under PRWORA, it is hard to imagine that Congress wished to leave the states free to offer the benefits and responsibilities of PRWORA only to certain people on a piecemeal, discriminatory basis.[6]

_____

[6] To the extent cases dealing with employment issues outside the FLSA context are relevant, we should follow the logic of our own decision in Brukhman v Giuliani (94 NY2d 387 [2000]) instead of the Second Circuit's decision in City of New York.  In

Finally, the majority's holding, in addition to lacking any legal basis, may raise serious practical problems.  Under the majority's rationale for deeming WEP participants to be City employees, taxpayers may ultimately have to foot the bill for an array of new expenses, including overtime, annual leave and sick leave.  Collective bargaining rules may soon apply to all workfare recipients, not just those who participate in a subsidized public employment program with an outside employer (see Social Services Law § 336-e), thereby stymieing the orderly administration of WEP.  And, the City, State and federal governments may have to reconcile the ordinarily tax-exempt status of WEP participants' assistance payments with the implication of today's decision that WEP participants essentially earn those payments as the sort of "wages" that are generally taxed in a regular employment context.  The majority may protest that its holding can be confined in one way or another, but given the majority's imaginative characterization of workfare and

Brukhman, we decided that WEP participants are not government employees protected by the prevailing wage provision of the state constitution (see Brukhman, 94 NY2d at 391-397).  Although we were careful to limit our holding to the interpretation of that constitutional provision (see id. at 397), we reached the conclusion that WEP participants are not City "employees" under the constitution based on many of the same factors which demonstrate that they are not City "employees" under FLSA, including the lack of any salary paid to participants in direct exchange for their services and WEP's goal of moving participants from a government assistance program into genuine employment (see id. at 395-396).  In light of those factors and the others listed above, petitioner and other WEP participants are not "employees" of the City within the meaning of FLSA.

invocation of legal authorities from clearly distinguishable contexts, attempts to limit the impact of the majority's decision to this case and this minimum wage statute will prove difficult at best and futile at worst. I would avoid this mess and follow existing law.[7]

### III.

In its effort to fit the square peg of assistance into the round hole of employment under FLSA, the majority defies the will of Congress, ignores the teachings of the Supreme Court and needlessly creates a split in authority between this Court and the Tenth Circuit. Because the majority's decision sows confusion in this important area of federal law, courts throughout New York and, potentially, the Nation must now struggle in vain to reconcile the majority's illogical holding with the relevant legislative scheme and common sense, and thus the majority's opinion will likely reverberate in unfortunate ways throughout the legal system. Since the plain language of FLSA and PRWORA, as well as the legislative purpose behind those statutes, show that WEP participants are not City "employees" entitled to the protections of FLSA, I dissent and vote to reverse the order of the Appellate Division.

---

[7] It is unclear under the majority's decision whether the government would ever be able to recoup lottery winnings from a WEP participant, since the government does not recover wages that it pays to employees. Presumably, even if petitioner had won a multi-million dollar lottery prize, the majority would let him keep every penny.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Supreme Court judgment appealed from and Appellate Division order insofar as sought to be reviewed affirmed, without costs. Opinion by Chief Judge Lippman.  Judges Rivera, Stein and Fahey concur. Judge Abdus-Salaam dissents in an opinion in which Judge Pigott concurs.

Decided November 19, 2015