OPINION OF THE COURT
Chief Judge Lippman.
We hold that petitioner, who performed work for the City of *276 New York in exchange for cash public assistance and food stamps, is protected by the federal minimum wage provisions of the Fair Labor Standards Act (FLSA).
Petitioner Carver is a 69-year-old Vietnam War veteran who received public assistance from the City of New York, through the State-funded Safety Net Assistance Program (see Social Services Law §§ 61, 62, 157 et seq.), beginning in 1993 and continuing until March 2000. During that time, the City required, in accordance with the Social Services Law (see Social Services Law §§ 335-b, 336-c), that he work 35 hours per week in the “Work Experience Program” (WEP) of the City’s Human Resources Administration (HRA) in order to receive public assistance benefits. HRA administers the State’s public assistance programs for New York City, with oversight from the New York State Office of Temporary and Disability Assistance (OTDA) (see generally Social Services Law § 61).
Carver was assigned to the mailroom of Coney Island Hospital where he sorted and delivered the mail. In 1995, he was reassigned to the Manhattan Terminal of the Staten Island Ferry, where he would sweep the floors, spread salt in the winter and pick up trash. In return for performing these services, Carver received $176 every two weeks, along with food stamps. His cash compensation plus the food stamps equaled the minimum wage for the amount of hours that he worked. If he missed work, his assistance was reduced. Carver never received any training in how to perform these jobs, or participated in any vocational training classes during those years. He participated in only one week of classes, which concerned how to write a resume and look for a job at the end of the program.
In 2000, Carver was told that he would have to leave WEP, and on March 4, 2000, his benefits were terminated. On August 10, 2007, Carver won $10,000 in the New York State Lottery. The New York State Division of Lottery and OTDA invoked Social Services Law § 131-r (1), which authorizes the State to appropriate half of any lottery prize over $600 to “reimburse [itself] . . . for all . . . public assistance benefits paid to [the prizewinner] during the previous ten years.”
In a letter dated September 27, 2007, Carver requested a review of OTDA’s determination. On January 8, 2008, OTDA notified Carver that it would not refund any of the $5,000. Carver then filed the underlying CPLR article 78 proceeding in April 2008 against OTDA, among others, alleging that the *277 interception of his lottery winnings violated his rights under the FLSA and the New York State Minimum Wage Act (Labor Law § 652). Specifically, Carver contended that the OTDA required him to work 35 hours per week in order to receive public assistance benefits, and that his biweekly cash benefits, plus the value of the food stamps he received, equaled no more than the federal or New York State minimum wage. Thus, were OTDA permitted to recoup a portion of the benefits paid to him through Social Services Law § 131-r, then Carver would be paid less than minimum wage, in violation of the FLSA. The respondents cross-moved, inter alia, to dismiss the petition pursuant to CPLR 3211 (a) (7).
Supreme Court granted the cross motion and dismissed the proceeding (Carver v State of New York, 24 Misc 3d 602 [Sup Ct, Kings County 2009]). As relevant here, the court noted that the issue of whether WEP workers are deprived of minimum wage standards by the implementation of Social Services Law § 131-r is an issue of first impression. The court stated that Carver implicitly agreed to “[t]he statutory requirement of recoupment of previous public assistance monies [he] had received” because by purchasing the lottery ticket he “was subject to all of the rules, regulations and statutes with respect to that lottery ticket” (id. at 608). The court then stated that Carver’s public assistance benefits were determined by “his household size, rent and other eligibility factors” under the Social Services Law, and not by the number of hours he worked per week in WEP (id.). Furthermore, the court determined that although the Social Services Law required Carver to engage in work activities “in return for [his public assistance] benefits,” he was not an employee who earned wages because no “employer-employee relationship” existed “as no income tax W-2 statement was furnished to [him] or deductions made for FICA or Medicare taxes” (id.). Finally, the court determined that Carver was “not a federally protected worker” as he was not an employee, and thus the federal minimum wage law does not apply to him (id. at 608-609).
The Appellate Division unanimously modified by reinstating the FLSA cause of action against OTDA and its Commissioner and, as so modified, affirmed. The Court stated that the State’s interception of Carver’s lottery prize winnings did not violate the state minimum wage law, which specifically exempts employees of “federal, state or municipal government or political subdivision thereof,” but that it did violate the FLSA (Mat *278 ter of Carver v State of New York, 87 AD3d 25, 29 [2d Dept 2011]). Applying the “economic reality test,” the Court concluded that individuals like Carver, who receive public assistance benefits and participate in WEP, are employees under the FLSA.
On remand, Supreme Court granted Carver’s petition against OTDA and its Commissioner, and directed respondents to return his $5,000. The parties then entered into a stipulation and order of contingent settlement which resolved all outstanding issues, including attorney’s fees.
This Court then granted OTDA leave to appeal from the stipulation and order of contingent settlement (Matter of Carver v State of New York, 23 NY3d 906 [2014]), bringing up for review the prior, nonfinal Appellate Division order. The sole issue on appeal is whether as a result of his participation in WEP as a condition of his receipt of public assistance benefits under Social Services Law § 336 (1) (d), Carver was entitled to minimum wages under the FLSA.
The FLSA was passed by Congress in 1938 “to lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions” and to eliminate low wages and long hours in an effort to “free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers” (Rutherford Food Corp. v McComb, 331 US 722, 727 [1947]). The FLSA was also enacted to prevent unfair competition through the use of underpaid labor (see 29 USC § 202 [a] [3]). The FLSA provides: “Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the” rates set forth in the statute (29 USC § 206 [a]). An “employee” is defined as “any individual employed by an employer” (29 USC § 203 [e] [1]). To “employ” is “to suffer or permit to work” (29 USC § 203 [g]). An employer includes “any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency” (29 USC § 203 [d]). Although the FLSA does explicitly exempt certain employees from its purview, neither workfare nor public assistance recipients are included among those exemptions (see 29 USC § 213; Powell v United States Cartridge Co., 339 US 497, 517 [1950] [stating that FLSA’s exemptions are “narrow and *279 specific,” and indicating that “(s)uch specificity in stating exemptions strengthens the implication that employees not thus exempted . . . remain within the Act”]).
To determine whether an individual qualifies as an employee under FLSA, we must look to the “economic reality,” not the “technical concepts,” of the relationship (Goldberg v Whitaker House Cooperative, Inc., 366 US 28, 33 [1961]; Tony & Susan Alamo Foundation v Secretary of Labor, 471 US 290, 301 [1985]; see also Bartels v Birmingham, 332 US 126, 130 [1947]). More specifically,
“[b]ecause [the FLSA] defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer. In answering that question, the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the ‘economic reality’ presented by the facts of each case. Under the ‘economic reality’ test, the relevant factors include ‘whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records’ ” (Herman v RSR Sec. Servs. Ltd., 172 F3d 132, 139 [2d Cir 1999] [citations omitted], quoting Bonnette v California Health & Welfare Agency, 704 F2d 1465, 1470 [9th Cir 1983]; see Goldberg, 366 US at 33; Johns v Stewart, 57 F3d 1544, 1557 [10th Cir 1995] [stating that the economic reality test is the proper test to determine “the scope of employee coverage under” the FLSA]).
In Johns v Stewart (57 F3d 1544 [1995]), the Tenth Circuit, applying the economic reality test, determined that workers in Utah’s work force program were not employees within the meaning of the FLSA. However, two years later, the United States Department of Labor (DOL), the federal agency charged with enforcing the FLSA, issued a guidance letter entitled “How Workplace Laws Apply to Welfare Recipients,” in which it undertook to explain, in question-answer format, which federal worker-protection laws applied to public assistance workers. The letter states:
*280 “Do federal employment laws apply to welfare recipients participating in work activities under the new welfare law in the same manner they apply to other workers?
“Yes. Federal employment laws, such as the Fair Labor Standards Act (FLSA), the Occupational Safety and Health Act (OSHA), Unemployment Insurance (UI), and anti-discrimination laws, apply to welfare recipients as they apply to other workers. The new welfare law does not exempt welfare recipients from these laws” (DOL Guidance Letter, brief for respondent at 40, exhibit B [emphasis omitted]).
According to the DOL, “[w]elfare recipients would probably be considered employees in many, if not most, of the work activities described in the [federal public assistance law]” (id.). The FLSA charges the DOL with the duty of administering and interpreting the FLSA. Accordingly, the DOL’s interpretation of the FLSA is “entitled to considerable weight in construing the Act” (Tony & Susan Alamo Foundation v Secretary of Labor, 471 US 290, 297 [1985]). A 1997 conference report (HR Rep 105-217, 105th Cong, 1st Sess at 934, reprinted in 1997 US Code Cong & Admin News at 176, 555) leaves no doubt the Congress was aware of and considered the DOL’s guidelines and accepted them, despite efforts to overturn DOL’s interpretation of the FLSA.[1]
To that end, we must apply the economic reality test and, under that test, the City should be considered Carver’s employer. The City had the power to hire and fire WEP workers, in that it was the City’s responsibility to assign public assistance recipients to a WEP agency and the City could dismiss workers from WEP based upon their performance. Additionally, the City and its WEP agencies supervise and control the work schedule of the workers. Furthermore, the City and its agencies, such as HRA, maintain the employment records of the WEP workers. While the Social Services Law, not the WEP *281 agencies or the City, determines the rate and method of payment of WEP workers, that is simply one factor. The economic reality test “encompasses the totality of [the] circumstances” (Herman, 172 F3d at 139).
For example, in Alamo (471 US 290), the United States Supreme Court applied the economic reality test to determine if certain individuals were “employees” under the FLSA. The Alamo Foundation was a not-for-profit organization founded to “ ‘establish, conduct and maintain an Evangelistic Church . . . and generally to do those things needful for the promotion of Christian faith, virtue, and charity.’ ” It supported itself by operating gas stations, stores and other businesses staffed by “associates.” Associates “receive[d] no cash salaries, but the Foundation provide [d] them with food, clothing, shelter, and other benefits” (471 US at 292).
Noting that it “has consistently construed the [FLSA] ‘liberally to apply to the furthest reaches consistent with congressional direction’ ” (id. at 296, quoting Mitchell v Lublin, Mc-Gaughy & Associates, 358 US 207, 211 [1959]), the Supreme Court found that the associates were “employees” (Alamo, 471 US at 301, citing Goldberg, 366 US at 33). The Court focused on three factors: (1) the associates received compensation, albeit “primarily in the form of benefits rather than cash,” a distinction deemed “immaterial”; (2) they were “entirely dependent upon the Foundation for long periods, in some cases . . . years”; and (3) any other result would have undermined the purposes of the FLSA by giving the Foundation a competitive advantage and “exert[ing] . . . downward pressure on wages in competing businesses” (Alamo, 471 US at 301, 302).
The economic reality test, as applied in Alamo, compels the conclusion that Carver was an “employee” of the City. The Staten Island Ferry is an enterprise similar to a privately owned ferry service or the gas stations and stores operated by the Foundation in Alamo. Carver’s work was no different from the janitorial services performed by salaried City employees at many offices and other locations. Like the associates in Alamo, Carver’s benefits were “compensation,” given in exchange for his work — even if some of those benefits were not paid in cash— and he was “entirely dependent” on those benefits for years.
Alamo also establishes that the employer’s purposes and objectives are not relevant in determining a worker’s status as an employee. The State argues that WEP workers are not *282 employees because its declared goal is to prepare WEP workers for gainful employment. However, this appears to be no different from the Foundation’s goals of Christian ministry. Had Carver spent most of his hours receiving training, or education in how to obtain employment outside of the WEP program, we might have reached a different conclusion. As the DOL stated, “individuals engaged in activities such as vocational education, job search assistance, and secondary school attendance” are likely exempt from the FLSA “because these programs are not ordinarily considered employment under the FLSA” (DOL Guidance Letter, brief for respondent at 40, exhibit B). However, based on the record before us, Carver spent his full-time hours doing work for the City. The dissent’s likening of Carver’s 7-year, 35-hour-workweek engagement through WEP to perform services typical of any other non-WEP employee to that of a “student or trainee” patently ignores the economic reality of Carver’s situation (see dissenting op at 293). Moreover, contrary to the dissent’s contention, the policies supporting the passage of the FLSA do weigh in favor of finding coverage here. Were the City permitted to hire and engage WEP workers for less than minimum wage, it could effectively suppress the market and impede the FLSA’s goal of eliminating unfair competition through the use of underpaid labor.
Furthermore, in United States v City of New York (359 F3d 83 [2d Cir 2004]), the Second Circuit determined that public assistance recipients obliged to participate in WEP are employees within the meaning of title VTI of the Civil Rights Act of 1964, and were thus entitled to title VIPs protection against sexual and racial harassment (id. at 86-87). The court determined that (1) the receipt of cash payments and food stamps, which equaled the minimum wage times the number of hours the WEP workers worked; and (2) the fact that a plaintiff who “refused to work would lose the portion of the family’s grant attributable to her . . . results in the conclusion that [the plaintiffs] were employees” (id. at 92). Although the FLSA was not the focus of the case in City of New York, the Second Circuit distinguished Johns and stated that even with respect to the FLSA, “the [DOL], the agency charged with interpreting the FLSA, has rejected the Johns approach” (id. at 94).
Following City of New York, two New York federal district courts have applied the same reasoning to cases involving minimum wage violation claims by public assistance recipients *283 participating in WEP, holding that they were employees (see Elwell v Weiss, 2007 WL 2994308, 2006 US Dist LEXIS 96934 [WD NY, Sept. 29, 2006, No. 03-CV-6121]; Stone v McGowan, 308 F Supp 2d 79 [ND NY 2004]). Accordingly, as the law stands today, Carver is correct in asserting that he was an “employee” of the City under the FLSA when he participated in the WEP program.
It is true that, in Brukhman v Giuliani (94 NY2d 387 [2000]), this Court, holding that the plaintiffs did not qualify for a prevailing wage, stated that WEP workers “simply are not in the employ of anyone” (id. at 395-396 [internal quotation marks omitted]). This Court, however, expressly limited the opinion, stating “we decide no more than is before us” (id. at 397 [limiting its holding to apply to the requirements of the New York Constitution’s wage provision]). Here, the Appellate Division rejected the State’s reliance on Brukhman because this Court did not apply the economic reality test, which, under federal law, is the applicable test for determining who is an employer under the FLSA. Additionally, Brukhman is distinguishable from this case because the plaintiffs there argued that they should have been paid at the prevailing state wage for their participation in WEP, whereas Carver’s claim is under the FLSA’s minimum wage standards. Quite simply, we are now confronted with an issue of federal law.[2] The Supreme Court has made clear that the FLSA, which “defines the verb ‘employ’ expansively to mean ‘suffer or permit to work.’ 52 Stat. 1060, § 3, codified at 29 U. S. C. §§ 203(e), (g),” has “striking breadth” and “stretches the meaning of ‘employee’ to cover some parties who might not qualify as such under a strict application of traditional agency law principles” (Nationwide Mut. Ins. Co. v Darden, 503 US 318, 326 [1992]; see Rutherford Food Corp., 331 US at 728-729). Thus, Brukhman is not controlling here.
The State contends that WEP workers cannot be employees because their assistance depends on “economic need,” measured by “specific household expenses,” and on “household size,” rather than on the type of work done or the workers’ skill. There is no reason, however, why the formula used to set a worker’s pay should affect whether or not he is an employee. *284 As the United States Supreme Court stated in Alamo, what matters under the FLSA is that, like Carver, the associates expected to receive in-kind benefits in exchange for services and were dependent upon those benefits (471 US at 301).
The State also relies on language in the state laws and regulations and the City’s Employment Process Manual stating that “the monetary grant . . . [for] participating in work-experience activities is not a wage for the performance of such activities” (internal quotation marks omitted; and see 18 NYCRR 385.9 [a] [4]). Such state law provisions, however, cannot override the FLSA. To the extent that any state or city laws come into conflict with governing provisions of the FLSA, they are preempted (Matter of People v Applied Card Sys., Inc., 11 NY3d 105, 113 [2008]).
Finally, the State attempts to sidestep two key factors which indicate that WEP workers can be employees. First, the State contends that WEP workers’ right to workers’ compensation benefits “has little if any significance” because volunteers also have limited rights to such benefits. Carver, however, is no volunteer. He worked full-time in the WEP program because he had to if he wanted to receive his needed benefits. Second, the State argues that the work performed by Carver does not have true monetary value because a WEP worker cannot replace the job of an actual City employee. However, regardless of whether Carver’s duties and responsibilities were identical to that of a non-WEP City worker, he qualifies as an employee under the economic reality test for FLSA purposes.
The gist of Carver’s argument is that he is entitled to minimum wage for his hours worked as a participant in the WEP program, and that the State cannot retroactively deprive him of a minimum wage by recouping the funds through his lottery prize. Carver’s request is actually consistent with the current practice. As mandated by Social Services Law § 336-c (2) (b),
“[t]he number of hours a participant in work experience activities authorized pursuant to this section shall be required to work in such assignment shall not exceed a number which equals the amount of assistance payable with respect to such individual (inclusive of the value of food stamps received by such individual, if any) divided by the higher of (a) the federal minimum wage provided that such *285 hours shall be limited as set forth in subdivision four of section three hundred thirty-six of this title, or (b) the state minimum wage.”
Carver’s particular situation compels the conclusion that he is entitled to minimum wage. While participating in the WEP program, Carver worked 35 hours per week, and the State concedes that this is not the norm. Additionally, the State’s actions here led to a particularly unfair result in that Carver was taxed on the full amount of his $10,000 lottery winnings, while being forced to surrender half of those winnings to the State.
Accordingly, the judgment of the Supreme Court appealed from and the order of the Appellate Division insofar as sought to be reviewed should be affirmed, without costs.

. The United States Department of Health and Human Services has also concluded that the FLSA applies to public assistance recipients under the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), also known as the “Welfare Reform Act” (see 45 CFR 260.35 [b] [“Federal employment laws (such as the Fair Labor Standards Act [FLSA], the Occupational Safety and Health Act [OSHA] and unemployment insurance [UI]) and nondiscrimination laws . . . apply to (Temporary Assistance for Needy Families) beneficiaries in the same manner as they apply to other workers”]).

. It is mystifying why, on a question of federal law, the dissent feels compelled to follow a Tenth Circuit decision predating the adoption of PRWORA and to amplify the import of Brukhman, while castigating the more recent teaching of the Second Circuit and the guidelines of the Labor Department (see dissenting op at 286, 297-298, 298-299 n 6).